## GRISWOLD v. HAZARD.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE DISTRICT OF RHODE ISLAND.

## GRISWOLD v. HAZARD.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
DISTRICT OF RHODE ISLAND.

## GRISWOLD v. HAZARD.

## GRISWOLD v. HAZARD.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE DISTRICT OF RHODE ISLAND.

Nos. 50, 53, 51, 52.   Argued and submitted April 10, 13, 1891. — Decided May 25, 1891.

An admitted or clearly established misapprehension of law in the making of
a contract creates a basis for the interference of a court of equity, rest-
ing on its discretion, and to be exercised only in unquestionable and fla-
grant cases.

Whether laches is to be imputed to a party seeking the aid of a court of
equity depends upon the circumstances of the particular case.

In this case it is held on the evidence that the bond given by Griswold in
the *ne exeat* proceeding conditioned that the defendant in that proceed-
ing should "abide and perform the orders and decrees" of the court was
executed by him under such an apprehension of the obligations in law
assumed by him in executing and delivering it, as to make it the duty of a
court of equity to reform it so as to make him liable for the penal sum
named, only in the event that the principal fail to appear and become
subject to the orders and decrees of the court; but that, the defendant in
the suit in which the *ne exeat* was issued having died, and such a decree
being therefore inappropriate, and Griswold being guilty of no laches, a
decree should be entered perpetually enjoining the prosecution of any
action, suit or proceeding to make him liable in any sum on or by reason
of said bond.

In the action at law upon the bond given in the *ne exeat* proceedings (No.
53) the court erred in ordering the amended pleas to be stricken from
the files.

D. was sued in the Supreme Court of Rhode Island by stockholders in the
Crédit Mobilier for an accounting and payment of what might be found

due on the accounting, for securities and moneys coming into his hands as president of the Crédit Mobilier. The receiver of that company in Pennsylvania released him from such liability. The Supreme Court of Rhode Island would not allow that release to be interposed as a defence. *Held*, that the error, if any, in this respect could not be corrected by bill in equity filed by a surety on a bond given to release D. when arrested on *ne exeat* proceedings in that Rhode Island suit.

A pleading presenting only a question of error in a judgment of a state court does not go to the jurisdiction.

THE first of the above suits was brought by Griswold, a citizen of New York, against the appellees, citizens of Rhode Island, to obtain a decree cancelling, or (if relief of that character could not be granted) reforming a certain bond, for the sum of $53,735, executed by Thomas C. Durant, as principal, and Griswold and S. D. Bradford, as his sureties. It was heard upon bill, answer and proofs, and the bill was dismissed.

The action at law, No. 53, was brought by the appellees against Griswold upon the above bond in one of the courts of Rhode Island, and was removed, upon his petition, to the Circuit Court of the United States for the District of Rhode Island, where a judgment was rendered against him for the sum of $66,470.

The other two cases, Nos. 51 and 52, were suits in equity brought by Griswold, pending the action at law in the Circuit Court, to obtain an injunction against its further prosecution.

The relief asked, in each of those suits, was denied, and the bills were dismissed.

All of the cases have their origin in a suit in equity brought, August 22, 1868, in the Supreme Court of Rhode Island, by Isaac P. Hazard, of that State, against Thomas C. Durant, Oliver Ames, Benjamin E. Bates, John Duff, Cornelius S. Bushnell, Sidney Dillon, Henry S. McComb, the Crédit Mobilier of America, a Pennsylvania corporation, and the Union Pacific Railroad Company, a corporation created by acts of Congress. Hazard sued on behalf of himself and all other stockholders in the first-named corporation who should become parties to his bill. Durant, from an early date in 1864 until May 18, 1867, was president of the Crédit Mobilier of America, having, it

was alleged, to a great extent, the management of its affairs
and the confidence of its directors and trustees, as well as the
control of its finances and disbursements, and of its treasurer,
clerks and servants.  The theory of the bill was that he had
acquired a large amount of the stock of the Crédit Mobilier
of America upon which dividends had been paid in money
and in the stock and bonds of the Union Pacific Railroad
Company, the amount of such bonds exceeding, it was alleged,
seven hundred thousand dollars, and the amount of such stock
of the last-named corporation being nearly two millions of dol-
lars; and that the shares of stock, bonds and moneys, so re-
ceived by him, belonged equitably to the Crédit Mobilier of
America and its stockholders.

The bill alleged that Durant's pecuniary condition was pre-
carious; that he was, and for a long time had been, largely
engaged in hazardous speculations and financial operations,
sustaining thereby heavy losses, and liable to sustain others;
that any recovery against him, it was feared, could not be
enforced by execution or the ordinary process of law; that he
was "about to depart out of the State and out of the jurisdic-
tion of this court;" and that the defendants, (the individual
defendants being sued as trustees in a certain contract with
the Union Pacific Railroad Company, the profits of which
belonged to the Crédit Mobilier of America and its stockhold-
ers,) " though requested so to do," had wholly neglected and
refused to take any steps to compel him to account for said
moneys, stocks and bonds, so received and improperly appro-
priated.

The principal relief asked was that Durant be required to
pay over and deliver to the Crédit Mobilier of America and
the plaintiff Hazard such sums of money and shares of stock
as should appear upon an accounting to be justly due or be-
longing to that corporation and to Hazard, and to make such
transfer of the stock and bonds as would fully protect its and
his rights in the premises; that the amounts ascertained to be
due be adjudged a lien upon the shares in the stock of each of
said corporations, owned or held by, or standing in the name
of, Durant, as well as upon the above contract assigned to the

defendant trustees, and the dividends, earnings, stocks and bonds received or to be received by virtue of that contract, to the extent of the shares to which Durant might be entitled under it; and that on default in the payment and delivery of the moneys, stocks and bonds so found due, all such stocks and bonds be sold under the direction of the court, or otherwise transferred and apportioned equitably among the rightful owners and claimants thereof; and that such stock, bonds, moneys, interest and rights, so procured by Durant, be deemed and taken as the rightful property of the Crédit Mobilier of America and its stockholders. The bill prayed that Durant be restrained from departing out of the State, and out of the jurisdiction of the court, by writ of *ne exeat,* issued under its seal and by its order.

A writ of *ne exeat* was ordered to be issued, August 22, 1868, for $53,735. It was in these words :

"Whereas it is represented to our Supreme Court, sitting in equity, on the part of Isaac P. Hazard and others, complainants, against Thomas C. Durant and others, defendants, that said Thomas C. Durant is greatly indebted to the said complainants, and designs quickly to go into other parts beyond this State, (as by oath made in that behalf appears,) which tends to the great prejudice and damage of the said complainants: Therefore, in order to prevent this injustice, we hereby command you that you do, without delay, cause the said Thomas C. Durant to come before you and give sufficient bail or security, in the sum of fifty-three thousand seven hundred and thirty-five dollars, that he, said Thomas C. Durant, will not go or attempt to go into parts beyond this State without the leave of our said court; and in case the said Thomas C. Durant shall refuse to give such bail or security, then you are to commit him, the said Durant, to our county jail, in your precinct, there to be kept in safe custody until he shall do it of his own accord ; and when you shall have taken such security you are forthwith to make and return a certificate thereof to our said court, distinctly and plainly, under your hand, together with this writ."

Durant was arrested under this writ on the night of August

22, 1868, and on the 24th he executed, with Griswold and Bradford, as his sureties, the following bond, drawn by one of Hazard's attorneys:

"Know all men that we, Thomas C. Durant, as principal, and John N. A. Griswold and S. Dexter Bradford, as sureties, are firmly bound to Isaac P. Hazard, Rowland Hazard, Rowland G. Hazard, Elizabeth Hazard, Elizabeth Hazard, trustee, Anna Hazard, Mary P. Hazard, Lydia Torrey, Sophia Vernon and Anna Horner in the sum of fifty-three thousand seven hundred and thirty-five dollars, to be paid said obligees, their executors, administrators or assigns; to which payment we bind ourselves, our several and respective heirs, executors and administrators, jointly and severally, hereby.

"Sealed with our seals and dated this 24th day of August, A.D. 1868.

"The condition of this obligation is that said Thomas C. Durant shall on his part abide and perform the orders and decrees of the Supreme Court of the State of Rhode Island in the suit in equity of Isaac P. Hazard and others against said Thomas C. Durant and others, now pending in said court within and for the county of Newport." This is the bond above referred to.

Under the latter date, and presumably before the execution of that bond, the attorneys of Hazard and Durant signed the following agreement: "In the above-entitled case it is agreed that said Thomas C. Durant shall file a bond, with surety in the penalty marked in the writ of *ne exeat* therein, to abide and perform the orders and decrees of the court in said cause, and that thereupon the writ of *ne exeat* aforesaid shall be discharged, and that the court may enter decree accordingly." The court, under the same date, entered the following order: "Thomas C. Durant, one of the defendants in this suit, having executed and filed a bond, with sureties, to abide and perform the orders and decrees of the court made in this suit, it is now, by consent, ordered that the writ of *ne exeat* heretofore issued be discharged." For some reason, not explained, the writ of *ne exeat* was not returned to the clerk's office and filed until October 21, 1868. The sheriff made this return on the

writ: "Newport, August 24, 1868. I caused the within-named Thomas C. Durant personally to come before me, as within commanded, on the 22d day of this month, and now the writ is discharged by order of court."

On the 2d of December, 1882, more than fourteen years after the commencement of Hazard's suit, it was ordered, adjudged and decreed in that suit, among other things, as follows:

"Second. That the defendant, Thomas C. Durant, is accountable for and do, within 90 days from the date hereof, pay the sum of $16,071,659.97, with interest from this date, the said sum, with interest thereon, to be deposited in the registry of this court, or, be paid, in the first instance, to Rowland Hazard, of South Kingston, in said State, and Henry Martin, of Brooklyn, in the State of New York, who are hereby appointed special commissioners, with authority, jointly and severally to collect and receive the same, and with power to take such steps to collect the same as may be necessary and according to law, and said fund, or so much thereof as may be collected by process or otherwise, is hereby directed to be paid and deposited in the registry of this court to the credit of this cause.

"Third. Of the aforesaid total sum of $16,071,659.97, the defendant, Thomas C. Durant, is hereby allowed and is decreed to be entitled to pay and discharge $8,816,232.93, or any part thereof *pro tanto*, by transferring and delivering stock of the Union Pacific Railroad Company and first mortgage and sinking-fund bonds of said company as per statement 'G,' now exhibited to the court and directed to be filed in this cause, with all dividends which may have been collected or received by said defendant or his assigns after the date of this decree, together with interest on the same to the date of payment thereof by said defendant, the certificates of said stock, with transfers thereof, and the said bonds to be delivered to the said Rowland Hazard and Henry Martin, who are hereby appointed special commissioners to receive the same, and who are hereby authorized and directed to sell the same, or such portions thereof as may be delivered to them from time to

time as they are secured, at public auction, and receive the proceeds thereof, and, after deducting the costs and charges of such sales, deposit the same in the registry of this court to the credit of this cause: *Provided, however*, That the said privilege herein granted to the said defendant, Thomas C. Durant, to transfer and deliver said stocks and bonds in partial discharge and payment of the sum herein before decreed to be paid by him be exercised by him within thirty days from the date of the entering this decree; and that in default of such transfer and delivery, or of the transfer and delivery of the entire amount of said stock and bonds within the said thirty days, the obligation of the defendant, Thomas C. Durant, to pay the said proportion of the said sum or of the residue of the same, after deducting the amount of such stocks and bonds as may be delivered, as aforesaid, at their face value, shall become, and is hereby declared to be, absolute: *And provided further, nevertheless*, That the said option or privilege of the said Thomas C. Durant shall not interfere in any manner with any order or decree in the cause touching the transfer, delivery, sale or other disposition of said stock and bonds.

"Fourth. The defendant, Thomas C. Durant, is likewise ordered and directed to transfer and deliver, within thirty days from the date hereof five thousand seven hundred and seven $\frac{45}{100}$ (5707$\frac{45}{100}$) shares of the stock of the Crédit Mobilier of America (which stock has been found by the master to have been purchased with the funds of the Crédit Mobilier, and which stock with any dividends or profits accrued or to accrue on the same, is hereby declared to be the property of said corporation, subject to the decrees and orders in this cause), with any interest, dividends, rights, benefits and profits which may have accrued to the said Thomas C. Durant as the holder of the said 5707$\frac{45}{100}$ shares of stock or any part thereof and not hereinbefore charged against him, said transfer and delivery to be made to the said Rowland Hazard and Henry Martin or either of them, as special commissioners, with power, which is hereby granted to said commissioners, forthwith to take such measures, by suit or suits in their own names or

otherwise, as they may be advised is lawful and necessary to enforce such transfer, collection or delivery, and said stocks to be held by said commissioners subject to the further order of the court in this cause.

"Fifth. All interlocutory injunctions heretofore made in this cause, so far as consistent with this decree, are declared to be and are hereby made perpetual, and the further consideration of the cause, and particularly as to allowances to the complainants for costs, expenses and services, and as to the distribution of the funds that may be deposited in the registry of the court to the credit of the cause, and also the consideration of any order or decree which may be necessary in the premises against the defendant, Thomas C. Durant, by reason of any default which may be made by him touching any portion of this decree, and also the consideration of any other and further decree herein against or concerning the defendants other than the said Thomas C. Durant, be, and they hereby are, directed to stand over, with leave to any party in interest, save parties in contempt or parties who may appear to be for any other cause disqualified, to apply at any time for further orders and directions."

The bill in case No. 50 was filed September 13, 1881. That suit proceeds upon these grounds: That the bond of August 24, 1868, whereby Griswold became bound, as one of the sureties of Durant, that the latter should " on his part abide and *perform* the orders and decrees of the Supreme Court of the State of Rhode Island in the suit in equity of Isaac P. Hazard and others against said Thomas C. Durant and others, now [then] pending in said court," was obtained by fraud and by concealment from him of facts he was entitled to have communicated to him before he assumed the obligations imposed by that instrument; that he intended to sign, and believed, at the time, that he signed, a bond which simply bound him for the appearance of Durant, so that he should be personally amenable to the process and orders of the court in the suit brought by Hazard; that the execution of the bond in question was the result of mistake; that the agreement whereby, upon the execution by Durant of a bond, the writ of

*ne exeat* was to be discharged, was made without his knowledge or consent, as was also the order of court in pursuance of such agreement, and was in derogation of his rights; that his purpose to become surety only for Durant's appearance to answer the process of the court, was well known at the time to the plaintiff and his attorneys, who prepared, and supervised the execution of, the bond; and that the writ of *ne exeat* was sued out upon the ground that Durant was about to depart from the State when, in fact, he only contemplated coming to the State.

Protesting that the legal effect of the bond was that he should be responsible only for the appearance of Durant so as to be subject to the process of the court in the Hazard suit, and averring his willingness to execute a proper *ne exeat* bond, he prayed that the bond in question be set aside as having been obtained by fraud, imposition and mistake, or reformed, as indicated, and that the defendants be restrained by injunction from enforcing it in its present shape.

The answers of the defendants put in issue the material allegations of the bill. The plaintiff filed a replication, and proofs being taken, and the cause heard, the bill as already stated, was dismissed. 26 Fed. Rep. 135.

The action at law, being case No. 53, was commenced, March 3, 1883, in one of the courts of Rhode Island, and was removed, upon Griswold's application, to the Circuit Court of the United States. The declaration set out the bond of August 24, 1868, alleged that Bradford, one of the sureties thereon, was dead, and that Durant had not kept its condition in that he had not performed the above decree of December 2, 1882, in the equity suit brought by Hazard; whereby the plaintiffs Rowland Hazard, Rowland G. Hazard, Anna Hazard, and Lydia Torrey were entitled to have and demand of him the amount of said bond, $53,735. A copy of that decree was made an exhibit in the declaration. The defendant Griswold filed ten pleas, each of which was in bar of the action. One of the pleas made a copy of the proceedings in Hazard's suit a part of it. Demurrers and replications were filed to the pleas, those to the second, third, fourth, fifth and seventh

pleas being special demurrers. By an order entered July 1, 1884, the demurrers were sustained to the second, third, fourth, fifth and seventh pleas, the opinion of the court being delivered by Mr. Justice Gray. 21 Fed. Rep. 178.

Pursuant to a stipulation of counsel, dated November 26, 1883, that the plaintiff might demur specially to the second, third, fourth, fifth and seventh pleas, and, in case the demurrers were overruled, reply to those pleas as if no demurrers had been filed, and that amended pleas, if desired, might be filed by the defendant, and in obedience to the order of court requiring the amended pleas to be filed on or before October 15, 1884, the defendant, on the 14th of October, 1884, filed amended third, fourth, fifth and seventh pleas. The case was subsequently heard on a motion by plaintiff, made November 19, 1884, that the amended pleas be stricken out, and on the 30th of March, 1885, this order was made: "Plaintiff's motion to strike amended pleas from the files is granted." Certain stipulations were made between counsel, among others, one to the effect "that the plaintiffs were able to prove under the decree of the Supreme Court of Rhode Island, in the equity suit brought by Hazard, an amount of damage in excess of the penal sum of the bond declared on in this suit." A jury having been waived in writing, the court gave judgment, as of February 12, 1887, against Griswold, for $66,470.

The suit in equity No. 51 was brought June 12, 1885. The bill in that case, after referring to the suit in equity brought by Isaac P. Hazard in 1868, showed that, on the 17th of November, 1875, Rowland G. Hazard commenced a suit in equity in one of the courts of Pennsylvania, against the Crédit Mobilier of America and others, which was subsequently removed to the Circuit Court of the United States for the Eastern District of Pennsylvania, that being the domicil of the corporation; that in such suit Oliver Ames was appointed receiver of all the goods, chattels, rights and effects of the corporation, and was authorized by the court in Pennsylvania to deliver to Durant a deed of release from all actions, causes of action, suits, bills, bonds, writings obligatory, debts, dues, duties, reckonings, accounts, sums of money, judgments, exe-

cutions, extents, quarrels, controversies, trespasses, damages and demands, whatever, both in law or equity, which the Crédit Mobilier of America then had, or might at any time thereafter have, claim, allege or demand, against said Durant, for or by reason or means of any matter, cause or thing whatever; that, afterwards, on the 27th day of October, 1881, Ames, under the said authority, and in consideration of the execution by Durant of a deed conveying the title to certain lands mentioned in the order of court authorizing the release, delivered to the latter a deed of release, of the kind above indicated, of all sums of money then due or owing to, or thereafter to become due to, said corporation; that the above equity suit in the Supreme Court of Rhode Island was, and had been, wholly controlled by Rowland G. Hazard; that notwithstanding the delivery of the above deed to Durant, the latter suit was proceeded with, and the Supreme Court of Rhode Island rendered a decree refusing to allow him to set it up as a bar to the entering of such decree, on the ground that he was in contempt of that court for violation of one of its decrees rendered therein; and that after the delivery of the deed of release to Durant the plaintiff requested the defendants to surrender the bond of August 24, 1868, and to abstain from suing him thereon, but they refused to comply with that request. The relief asked was an injunction restraining the defendants from further proceeding in the action at law. Upon a hearing before Judges Colt and Carpenter a demurrer to the bill was sustained, and the bill dismissed, October 28, 1886, Judge Carpenter delivering the opinion of the court. 28 Fed. Rep. 597.

The bill in case No. 52 was filed June 12, 1885. It assailed the jurisdiction of the Supreme Court of Rhode Island over the subject matter of the suit in equity brought by Hazard upon the ground that before bringing it neither the plaintiff therein, Isaac P. Hazard, nor any other stockholder of the Crédit Mobilier of America, requested the managing committee of the board of directors or the stockholders of that corporation to begin legal or equitable proceedings against Durant. The cause was heard upon demurrer before Judges Colt and

Carpenter. The demurrer was sustained and the bill dismissed, the opinion of the Circuit Court being delivered by Judge Carpenter. 28 Fed. Rep. 578.

*Mr. James C. Carter* for Griswold argued Nos. 50 and 53, and submitted Nos. 51 and 52.

In No. 50 the specification of errors relied upon was as follows:

*First.* — That the court below erred in overlooking the distinguishing feature of the case that the obligation sought to be cancelled or reformed was one of *suretyship,* and was entered into under circumstances well calculated to create *misapprehension* in the minds of the obligors as to its real character;

*Second.* — That the court below erred by acting upon the view that in order to entitle the complainant to relief it was necessary to show that *both* parties to the instrument understood that it was to be a bond for the *appearance* only of Durant in the equity suit, and that it was not enough to show that the complainant, Griswold, supposed it to be of that character, and that the obligees took it, well knowing or having good reason to know that such was the belief under which the complainant Griswold was acting.

*Third.* — That the court below, even upon the view that the case was the ordinary one of an attempt to impeach a written instrument on the ground of mistake, and without reference to the points of the character of the obligation as being that of suretyship, and of the peculiar circumstances under which it was procured, erred by deciding, against the weight of evidence, that the mistake was not sufficiently proved.

The following cases were cited by *Mr. Carter* in this case: *Barber* v. *Barber,* 21 How. 582; *Samuel* v. *Howarth,* 3 Meriv. 272, 278; *Railton* v. *Mathews,* 10 Cl. & Fin. 935; *Russell* v. *Asley,* 5 Ves. 96; *Brayton* v. *Smith,* 6 Paige, 489; *McNamara* v. *Dwyer,* 7 Paige, 239; *S. C.* 32 Am. Dec. 627; *Mitchell* v. *Bunch,* 2 Paige, 605; *S. C.* 22 Am. Dec. 669: *Johnson* v. *Clen-*

*denin,* 5 Gill & J. 463; *Hamilton* v. *Watson,* 12 Cl. & Fin. 109, 119; *Franklin Bank* v. *Cooper,* 36 Maine, 179, 197; *Williams* v. *Bayley,* L. R. 1 H. L. 200; *Davies* v. *Lond. Prov. Mar. Ins. Co.,* 8 Ch. D. 469; *Wythes* v. *Labouchere,* 3 De G. & J. 593; *Phillips* v. *Foxall,* L. R. 7 Q. B. 666; *Meadows* v. *Meadows,* 16 Beav. 401; *Millar* v. *Craig,* 6 Beav. 433; *Cocking* v. *Pratt,* 1 Ves. Sen. 400; *Brown* v. *Lamphear,* 35 Vermont, 252; *Paget* v. *Marshall,* 28 Ch. Div. 255; *Garrard* v. *Frankel,* 30 Beav. 445; *Small* v. *Currie,* 2 Drewry, 102, 114; *Wauters* v. *Van Vorst,* 28 N. J. Eq. 103; *Slocomb* v. *Robert,* 16 La. 173; *Lloyd* v. *McTeer,* 33 Georgia, 37.

In No. 53 *Mr. Carter's* specification of errors relied on was as follows:

*First.* — That the court below erred in sustaining the demurrer to the second original plea.

*Second.* — That the court below erred in sustaining the demurrer to the third original plea.

*Third.* — That the court erred in striking out the third plea as amended.

*Fourth.* — That the court erred in sustaining the demurrer to the fourth original plea.

*Fifth.* — That the court erred in striking out the fourth plea as amended.

*Sixth.* — That the court erred in sustaining the demurrer to the fifth original plea.

*Seventh.* — That the court erred in striking out the fifth plea as amended.

*Eighth.* — That the court below erred in not granting at the trial the motion of the plaintiff in error for judgment on his eighth plea.

*Ninth.* — That the court below erred in not granting at the trial the motion of the plaintiff in error for judgment on his ninth plea.

He cited: *Railton* v. *Mathews,* 10 Cl. & Fin. 935; *Williams* v. *Bayley,* L. R. 1 H. L. 200, 219; Brandt on Suretyship, §§ 365, 366; Baylies on Sureties, p. 293; *Lee* v. *Jones,* 17 C. B.

(N. S.) 482; *Franklin Bank* v. *Cooper*, 36 Maine, 179; *Pidcock* v. *Bishop*, 3 B. & C. 605; *The Cumberland Coal Co.* v. *The Hoffman Steam Coal Co.*, 30 Barb. 159, 171; *Howell* v. *Chicago & Northwestern Railroad*, 51 Barb. 378; *Strong* v. *Grannis*, 26 Barb. 122; *Osborn* v. *Robbins*, 36 N. Y. 365; *Ingersoll* v. *Roe*, 65 Barb. 346; *State* v. *Brantley*, 27 Alabama, 44; *Griffith* v. *Sitgreaves*, 90 Penn. St. 161.

*Mr. Elias Merwin* and *Mr. Samuel Maddox* submitted all the cases on their briefs.

In No. 50 they cited: *Wallingford* v. *Mutual Society*, 5 App. Cas. 685; *Griswold, Petitioner*, 13 R. I. 125; *Hazard* v. *Durant*, 9 R. I. 602, 606, Potter, J.; *Dick* v. *Swinton*, 1 Ves. & Bea. 371; *Stewart* v. *Graham*, 19 Ves. 312; *Hearn* v. *Insurance Co.*, 20 Wall. 490; *Snell* v. *Insurance Co.*, 98 U. S. 85; *Stockbridge Iron Co.* v. *Hudson Iron Co.*, 102 Mass. 45; *S. C.* 107 Mass. 290, 316; *Harrison* v. *Hartford Insurance Co.*, 30 Fed. Rep. 862; *Hunt* v. *Rousmaniere*, 1 Pet. 1, 15; *Upton Assignee* v. *Tribilcock*, 91 U. S. 45; *United States* v. *Ames*, 99 U. S. 35, 46; *Railroad Company* v. *Souther*, 13 Wall. 517, 524; *Hart* v. *Hart*, 18 Ch. D. 670; *Irnham* v. *Child*, 1 Brown Ch. 92; *Allen* v. *Galloway*, 30 Fed. Rep. 466; *Rashdall* v. *Ford*, L. R. 2 Eq. 750, 754; *Blackburn's Case*, 8 De G. McN. & G. 177, 180; *Germ. Am. Ins. Co.* v. *Davis*, 131 Mass. 316; *Oliver* v. *Insurance Co.*, 2 Curtis, 277, 296.

In No. 53 they cited: *Slack* v. *McLagan*, 15 Illinois, 242; *Capuro* v. *Builders' Ins. Co.*, 39 California, 123; *Murphy* v. *Byrd*, Hemp. 221; *Cole* v. *Joliet Opera Co.*, 79 Illinois, 96; *Service* v. *Heermance*, 2 Johns. 96; *Hale* v. *W. Va. Oil &c. Co.*, 11 W. Va. 229, 235; *Jones* v. *Albee*, 70 Illinois, 34; *Sterling* v. *Mercantile Ins. Co.*, 32 Penn. St. 75; *S. C.* 72 Am. Dec. 773; *Darnell* v. *Rowland*, 30 Indiana, 342; *J'Anson* v. *Stuart*, 1 T. R. 748; *Hynson* v. *Dunn*, 5 Arkansas, 395; *Hopkins* v. *Woodward*, 75 Illinois, 62, 65; *Abraham* v. *Gray*, 14 Arkansas, 301; *Thoroughgood's Case*, 2 Rep. 9; *Hawkins* v. *Hawkins*, 50 California, 558; *Rogers* v. *Place*, 29 Indiana, 577; *Seeright* v. *Fletcher*, 6 Blackford, 380; *Insurance Co.* v. *Hodgkins*, 66 Maine, 109; *Miller* v. *Elliott*, 1 Indiana, 267; *S. C.* 50 Am.

Dec. 475; *Starr* v. *Bennett*, 5 Hill, 303; *Clem* v. *Newcastle & Danville Railroad*, 9 Indiana, 488; *S. C.* 68 Am. Dec. 653; *Blackburn's Case*, 8 DeG. M. & G. 176; *Rashdall* v. *Ford*, L. R. 2 Eq. 750; *McDonald* v. *Trafton*, 15 Maine, 225; *Zehner* v. *Kepler*, 16 Indiana, 290; *Moss* v. *Riddle*, 5 Cranch, 351, 357; *Hazard* v. *Durant*, 11 R. I. 195; *Harvey* v. *Taylor*, 2 Wall. 328; *Cooper* v. *Reynolds*, 10 Wall. 308; *Cornett* v. *Williams*, 20 Wall. 226; *Jesup* v. *Hill*, 7 Paige, 95; *Hazard* v. *Durant*, 9 R. I. 602, 606; *People* v. *Norton*, 5 Selden, 176; *Bassett* v. *Crafts*, 129 Mass. 513; *Huscombe* v. *Standing*, Cro. Jac. 187; *Mantell* v. *Gibbs*, Brownl. & Gold. 64; *Plummer* v. *The People*, 16 Illinois, 358; *Robinson* v. *Gould*, 11 Cush. 55; *Fay* v. *Oatley*, 6 Wisconsin, 42; *McClintick* v. *Cummins*, 3 McLean, 158; *Thompson* v. *Lockwood*, 15 Johns. 256; *Fisher* v. *Shattuck*, 17 Pick. 252; *Bowman* v. *Heller*, 130 Mass. 153; *Harris* v. *Carmody*, 131 Mass. 51; *Griffith* v. *Sitgreaves*, 90 Penn. St. 161; *Peck* v. *Jenness*, 7 How. 612; *Hutchinson* v. *Green*, 2 McCrary, 471; *Atwood* v. *Merryweather*, L. R. 5 Eq. 464; *Tracy* v. *First Nat. Bk.*, 37 N. Y. 523; *Booth* v. *Clark*, 17 How. 322; *United States* v. *Buford*, 3 Pet. 12, 31, 32; *Ex parte Bradstreet*, 7 Pet. 634, 647; *Chirac* v. *Reinicker*, 11 Wheat. 280, 302.

In No. 51 they cited: *Insurance Co.* v. *Bailey*, 13 Wall. 616, 621; *Balance* v. *Forsyth*, 24 How. 183; *Lee* v. *Lancashire &c. Railway*, 6 Ch. Ap. 527; *Fuller* v. *Cadwell*, 6 Allen, 503; *Anthony* v. *Valentine*, 130 Mass. 119; *McElmoyle* v. *Cohen*, 13 Pet. 326; *Mills* v. *Duryea*, 7 Cranch, 481; *United States* v. *Throckmorton*, 98 U. S. 61, 65, 66; *White* v. *Crow*, 110 U. S. 183, 189; *Cooper* v. *Reynolds*, 10 Wall. 308, 316, 317; *Cornett* v. *Williams*, 20 Wall. 308, 316, 317; *Bateman* v. *Willoe*, 1 Sch. & Lef. 201, 204, 205, 206; *Castrique* v. *Imrie*, L. R. 4 H. L. 414; *Godard* v. *Gray*, L. R. 6 Q. B. 139.

In No. 52 they cited: *Peck* v. *Jenness*, 7 How. 612, 625; *Cooper* v. *Reynolds*, 10 Wall. 316; *Jesup* v. *Hill*, 7 Paige, 95; *Griswold, Petitioner*, 13 R. I. 125.

Mr. Justice Harlan, after making the above statement, delivered the opinion of the court.

These four cases are so closely connected in their facts, as well as in the questions of law presented for determination, that it is convenient to dispose of them by one·opinion.

Our attention will be directed first to case No. 50, in which a decree is sought to cancel, or in the alternative, to reform the bond of August 24, 1868, executed by Durant as principal, and by Griswold and Bradford as sureties, and to restrain the defendants from suing upon it in its present form. The granting or refusing of such a decree depends,, of course, upon the inquiry whether the plaintiff Griswold has, by evidence sufficiently clear and convincing, manifested his right to the relief asked.

While in respect to some matters there is a conflict among the witnesses, certain facts and circumstances are clearly established, and may be summarized as follows: Durant, in August, 1868, was a citizen and resident of New York. He went to Newport for a brief stay, and was there on the morning of Saturday, August 22. About noon of that day the suit, in which the writ of *ne exeat* issued, was commenced against him. He was then sailing, with several friends, in his yacht on the high seas. The yacht landed at the Newport wharf shortly before eleven o'clock at night. Upon his stepping ashore he was notified by two officers, who had kept continuous watch for him at the wharf during the afternoon, that they had a writ for his arrest — meaning the above writ of *ne exeat* — and that he must go to jail. He accompanied them to that place, one of the counsel of Hazard, Mr. Peckham, following on foot to the sheriff's office. Information of the arrest having been communicated to Mr. H. W. Gray, also a citizen of New York, temporarily at Newport, that gentleman went to Griswold, who was his uncle, and begged the latter to go to the jail and become bail for Durant's appearance. Griswold had only a slight acquaintance with Durant, never having met him until the spring of 1868, and held no personal or business relations of any kind with him. To oblige his nephew, who was Durant's friend, and merely as an act of kindness and courtesy to a stranger (Griswold then resided in Newport), he acceded to the request to become bail for Durant's appearance in court,

and for that purpose only went to the jail. Hazard learned, a little before eleven o'clock, that Durant had been arrested as he landed from his yacht, and that owing to the lateness of the hour the sheriff had taken him directly to the jail instead of his own office, "as had been previously arranged." He went immediately to the lodgings of one of his attorneys, Mr. Bradley, and caused him to "go and see what could be done to prevent Durant from remaining in jail over Sunday;" authorizing his attorney to use his name "for the purpose of releasing said Durant from jail until Monday, it being regarded as very doubtful whether Durant in the short time then remaining before Sunday would be able to provide the necessary bonds."

Shortly after Griswold, accompanied by Gray, reached the jail, the two counsel of Hazard, namely, Bradley and Peckham, arrived there, and a few moments later Governor Van Zandt came in obedience to a message from Durant, conveyed by Bradford, to act as his counsel. Hazard, it seems, did not accompany his counsel to the jail. It was now nearly twelve o'clock. All who were at the jail agree that they were there only because of the arrest of Durant under a writ commanding the sheriff to take bail from him, in the sum of $53,735, that he would not go or attempt to go into parts beyond the State without the leave of the court, and, if such bail were not given, to commit him to and keep him in jail until he gave bail of his own accord; and, such security being taken, the officer was required by the writ to return a certificate thereof to the court. There is no claim that any one present was ignorant of the terms of the writ, or of the extent of the authority of the officer charged with its execution. It is further agreed by all the witnesses that there was a conversation at the jail between the lawyers and Durant as to what could be done in order to effect the latter's release. But in this discussion or conversation Griswold took no part whatever. That much is distinctly stated by Peckham, one of Hazard's attorneys who drew the bond, and supervised the execution of the writ of *ne exeat*, although he says that the sureties could not "help hearing, if they paid any attention." It is equally beyond dispute that

the object of Griswold's presence at the jail was well known to Hazard's attorneys.

Just here arises the difference among the witnesses as to what took place at the jail. Detailing what occurred according to his recollection at that place, Peckham says: "When I got to the jail I found there Judge Bradley, who had only preceded me there by a minute or two, Mr. Durant, Charles C. Van Zandt, his counsel, Mr. Griswold, Dexter Bradford, and a stranger, who was, I presume, Mr. Gray. Mr. Van Zandt and Judge Bradley were already talking about the release of Mr. Durant from custody. Judge Bradley said: 'That is a simple matter. Let him give the bond called for by the writ.' The nature of that bond was briefly explained. Mr. Durant said that it was out of the question for him to give it; that he couldn't remain any longer in Rhode Island; that his presence was absolutely demanded outside of the State, and forthwith; and that he must leave here Monday morning. It was suggested that he might file his answer and apply for the discharge of the writ immediately; but he said, 'I know what proceedings in court are, and I can't remain here at all.' It was then proposed that he should give a bond in the same amount marked in the two writs in the two cases, conditioned to abide and perform whatever decrees the court might make against him in those suits. The nature of these proposed bonds was freely discussed by Judge Bradley, Mr. Van Zandt, and Mr. Durant, and the fact that they were bonds which would hold the principal and sureties liable to pay money in case Durant should not perform any decree made by the court was commented on by Mr. Van Zandt and Mr. Durant. During all this interview Judge Bradley did all the talking for the complainants, and Mr. Van Zandt and Mr. Durant spoke about equally for their side." The same witness states: "Mr. Van Zandt having conferred with Mr. Durant, and those two having conferred with the sureties — I mean Mr. Griswold and Mr. Bradford — Mr. Van Zandt then announced that they would give the bonds proposed. As it was then very late, it was further agreed that all should meet at my office on the following Monday morning, soon after mid-

night, and execute the papers. Besides these bonds, it was also agreed that the respective counsel should sign an agreement that upon the bonds being executed the writs of *ne exeat* should be absolutely discharged. Just at the close of the interview Judge Bradley addressed himself to all present, saying that he wished to make sure that all understood the arrangement alike, and he stated that Mr. Durant was to give bonds, with Mr. Griswold and Mr. Bradford as sureties, in the sums marked in the writs, to abide and perform all the decrees of the court in the suit; that counsel should sign agreements for the discharge of the writs; that all should meet at my office soon after midnight Monday morning and sign the papers; that in the meantime Mr. Durant would go free from custody upon his word of honor, and he appealed to the sureties, saying: 'We rely upon you, gentlemen, to see that he attends.' We then separated. I prepared the papers and had them lying upon my table when we met, pursuant to the arrangement. They were read. Mr. Griswold took an active part at this meeting and, I think, read the papers for himself. The papers were signed without any objection or discussion at that time. Probably we were not together at my office more than ten minutes." Referring to the interview at the jail, Bradley testified that nothing was said, to the best of his recollection and belief, by any one, conveying the idea that the complainants were to obtain from the defendant only a bail bond for his appearance; and that "the terms of the bond were expressed, so as to exclude the idea that it was merely a bail for appearance, and to provide that it should be a bond to abide and perform the order of the court." He further said that the bond "was to be a security," and it was so announced. In all material respects his evidence was in accord with the recollection of Peckham.

But there was other evidence which precludes our accepting the version of the affair given by those gentlemen. Gray, Griswold, Durant and Van Zandt, with more or less distinctness, but all emphatically, state that neither at the jail Saturday night, nor at the meeting before daylight on Monday morning, was there a hint, suggestion or proposition, in any

form, that Durant should give bond, with sureties, conditioned that he would abide and *perform* the decrees that might be rendered in the Hazard suit, or that any bond was talked of except one that would make the sureties responsible simply for his appearance in the State, so as to be subject to the orders and process of the court.   Gov. Van Zandt testifies, touching the meeting at the jail :. "It was proposed by Judge Bradley that Dr. Durant should give bond, with two sureties, which should be substituted for the writ and the writ withdrawn.   I then understood from the conversation that the bond was in the nature of a bail bond, and that when the sureties delivered Dr. Durant into the custody of the court, to either perform its orders and decrees personally, or to suffer such penalties personally as the court might impose, they would comply with the conditions of the bond.   Nothing was said in my presence by any person inconsistent with these views."   Again, referring to what took place at the time the bond was actually signed, the same witness says : "A bond, prepared by Messrs. Peckham and Bradley, was handed to me. as counsel for Mr. Durant ; there was some little discussion as to whether it should be made to the sheriff of Newport County, or to the complainants in the then suit. Judge Bradley preferred the latter, and it was so done.  I told Mr. Durant that, in my opinion, it was a proper bond to secure his appearance in the suit, and the bond was then executed.  . . . . I. heard nothing said by Judge Bradley or Mr. Peckham, except what I have already stated.   I myself told Mr. Durant that, in my opinion, the instrument was, in effect, a bail bond." Further : "There was nothing said or intimated by any person in my presence or hearing on that occasion to indicate that the bond was a security instead of a surety."   The statements of Gov. Van Zandt are fully sustained by the depositions of Gray, Griswold and Durant.

In view of this great preponderance of evidence upon the side of the plaintiff, as to what occurred at the jail before the separation of the parties to meet Monday morning for the consummation of the business, the court is not at liberty to accept the account given by the defendants' attorneys of

the interview of Saturday night. And we have a strong conviction that the recollection of Griswold, Gray, Durant and Van Zandt, as to that interview, is sustained by all the inherent probabilities of the case. And in saying this, we would not be understood as reflecting upon the integrity of Hazard's attorneys. The difference in the recollection of gentlemen, in respect to transactions in which they took part, often happens, without any reason to suspect that any of them would intentionally deviate from the line of absolute truth. Such differences existing, the court can only be guided by the weight of the evidence, where the witnesses are intelligent, of equal credibility, and had equal opportunities to know what occurred. In the first place, it is not at all probable that Griswold would have executed the bond in question, as surety, if he had been informed, or believed, that it bound him absolutely, within the amount specified in such bond, for the payment of any sum adjudged against Durant—almost an entire stranger to him. In the next place, we cannot suppose that the counsel who went to the jail, to represent the interests of Hazard, had any other purpose in going there except to see that that was, substantially, accomplished which the writ of *ne exeat* authorized, namely, the obtaining of bail that would prevent Durant's departure from the State without the leave of the court, and thus have him, at all times, pending Hazard's suit, subject to its rightful power in respect to any decree to be rendered. That was evidently Bradley's purpose, for, according to Peckham's evidence, he suggested that Durant could effect his release by executing the bond specified in the writ. But when the nature of such a bond was explained, and it appeared that the necessity for Durant's being out of the State on Monday rendered that course entirely impracticable, the latter was then informed —according to the evidence of Peckham —that he could file an answer and apply for the discharge of the writ immediately. What was meant by this suggestion? It could have meant but one thing, namely, that it was in the power of Durant to obtain, without objection, if not of right, a discharge of the writ, after answering, by executing a bond of some kind. A party arrested

upon *ne exeat* may obtain the discharge of the writ, upon motion or petition, and after notice, and according to some authorities, " it is a matter of course to order the *ne exeat* to be discharged, upon the defendant's giving security to answer the complainant's bill, and to render himself amenable to the process of the court pending the litigation, and to such process as may be issued to compel a performance of the final decree. . . . Or, where the defendant cannot procure such security as will satisfy the sheriff, or if he wishes to leave the State before the termination of the suit, he may apply to the court to discharge the *ne exeat* upon his giving proper security to answer and be amenable to process. And upon such application, the court will take such security as it may deem sufficient, and will discharge the sheriff from liability." 2 Barb. Pr. 655–6 ; *Mitchell* v. *Bunch*, 2 Paige, 606, 621 ; *Brayton* v. *Smith*, 6 Paige, 489, 491 ; *McNamara* v. *Dwyer*, 7 Paige, 239, 244. See, also, Jacob's Law Dict. Title, *ne exeat regno ; Johnson* v. *Clendenin*, 5 G. & J. 463, 481. In *Griswold, Petitioner*, 13 R. I. 126, determined September 20, 1880, Griswold, by petition, sought to be discharged from the bond in question on his principal's placing himself within the jurisdiction of the court and subject to its orders and decrees. He seems to have proceeded, in that case, upon the ground that he was entitled, of right, to the order of discharge asked. But the Supreme Court of Rhode Island did not accept that view, observing that it could not regard "a bond to abide and perform the decree as equivalent merely to a bond to abide the event of the suit." To do so, the court said, would be to ignore wholly the word "perform" contained in the bond, which, upon its face, appeared to be given by agreement of the parties. While it was there said, and properly, that the court may require as a condition of the discharge of a writ *ne exeat*, that the respondent give security to perform the decree — citing *Robertson* v. *Wilkie*, Amb. 177, and *Atkinson* v. *Leonard*, 3 Bro. C. C. 218 — it was conceded that " courts will generally discharge a writ of *ne exeat* upon the respondents' giving security to abide the decree on the hearing of the suit." If Durant had remained in Newport and, upon filing his answer, had applied

for the discharge of the writ of *ne exeat* upon his giving bond with security simply to abide the decree, and place himself, when required, within the jurisdiction of the court, it is inconceivable that the state court would, under the circumstances, have denied his application. But it was further said in that case — and this is quite significant in its bearing upon another question to be presently adverted to — that " even if the bond in question was to be considered as having no other effect than a bond to abide the decree made upon hearing the cause, the petition could not be granted in the present stage of the proceedings. No final decree in the cause has yet been reached."

As, therefore, Durant could have filed his answer, and, conformably to the general rule, have obtained a discharge of the writ upon giving bond, with surety, that he would be amenable to the orders and process of the court; as he could not, consistently with his engagements, remain in Rhode Island long enough to have an answer prepared, and to move for the discharge of the writ, upon sufficient bond to be by him given; and as Hazard and his counsel expressed a desire that Durant should not be held in custody over Sunday, what more natural and equitable than that the parties should, *by consent*, bring about that which Durant must have understood from Bradley that he could accomplish, through the orders of the court, namely, have, a bond executed with surety compelling his presence in the State when required by the orders of the court, or subjecting his sureties to personal liability if he did not render himself amenable to its process. If the suggestion that Durant could file his answer and apply to the court for the discharge of the writ (of course, upon bond securing his amenability to the process of the court) had been adopted, the plaintiff would not have obtained a bond making the surety absolutely responsible, within the penal sum named in the writ and bond, for a money decree against Durant. It is, therefore, unreasonable to suppose that the parties separated Saturday night under an agreement that Hazard should have from Durant a bond that would subject his sureties to a larger responsibility than was involved in the suggestion made that

Durant could obtain an order of court for the discharge of the writ. On the contrary, it is more reasonable to suppose that the bond which, on Saturday night, was agreed to be executed on the next Monday morning, was one that would accomplish, by agreement of parties, precisely what Hazard's attorney suggested that Durant might accomplish by an order of court. The agreement of the parties was thus made to take the place of an order of court, because Durant assured Hazard's attorneys that he could not remain in Newport long enough to make a formal application for the discharge of the writ upon a proper bond.

We are of the opinion that, although the condition of the bond in question was that Durant should "abide and *perform* the orders and decrees" of the court in the suit in which it was given, all the parties, according to the decided preponderance of evidence, intended it, at the time, as an instrument binding the sureties for the appearance of the principal so as to be amenable to the process and decrees of the court, upon default in which, and not before, were they to be liable to pay the penalty. If the bond means, in law, more than that — and counsel in this court agree that it does — the case is one of a mutual mistake, clearly established, as to the legal effect of the instrument. There was no mistake as to the mere words of the bond ; for it was drawn by one of Hazard's attorneys, and was read by Griswold before signing it. But, according to the great weight of the evidence, there was a mistake, on both sides, as to the legal import of the terms employed to give effect to the mutual agreement. In short, the instrument does not express the thought and intention which the parties had at the time of its execution. And this mistake was attended by circumstances that render it inequitable for the obligees in the bond to take advantage of it. The instrument was drawn by one of Hazard's attorneys, and was presented and accepted as embodying the agreement previously reached. Griswold was unskilled in the law, and took the word "perform" as implying performance in the sense of Durant's becoming amenable to the process of the court. He had no reason — unless the recollection of Gray, Durant, Van

Zandt and himself as to what occurred is wholly at fault — to doubt that the bond expressed the real agreement; especially if he heard Van Zandt's statement to Durant, when the latter was about to sign the bond, that it "was, in effect, a bail bond." A court of equity ought not to allow that mistake, satisfactorily established and thus caused, to stand uncorrected, and thereby subject a surety to liability he did not intend to assume, and which, according to the decided preponderance of the evidence, there was at the time no purpose to impose upon him. While it is laid down that "a mere mistake of law, stripped of all other circumstances, constitutes no ground for the reformation of written contracts," yet "the rule that an admitted or clearly established misapprehension of the law does create a basis for the interference of courts of equity, resting on discretion and to be exercised only in the most unquestionable and flagrant cases, is certainly more in consonance with the best-considered and best-reasoned cases upon this point, both English and American." *Snell* v. *Insurance Co.*, 98 U. S. 85, 90, 92; 1 Story Eq. Jur. § 138 *e* and *f*, Redf. ed.; *Stockbridge Iron Co.* v. *Hudson Iron Co.*, 102 Mass. 45, 48; *Underwood* v. *Brockman*, 4 Dana, 309, 316; *Jones* v. *Clifford*, 3 Ch. D. 779, 791, 792; *Canedy* v. *Marcy*, 15 Gray, 373, 377; *Green* v. *Morris & Essex Railroad Co.*, 1 Beasley, 165, 170; *Beardsley* v. *Knight*, 10 Vermont, 185, 190; *State* v. *Paup*, 13 Arkansas, 129; 2 Leading Cases in Eq. pt. 1, 979 to 984; 2 Pomeroy's Eq. §§ 843 to 847.

The conclusion reached upon this branch of the case is the only one consistent with fair dealing towards those who were willing to become sureties for the appearance of Durant. If it be not justified upon the ground of mistake as to the mutual agreement, superinduced by the conduct of the party seeking now to take advantage of it, there could be no escape from the conclusion that the taking of a bond that made Griswold absolutely liable as surety, for any amount adjudged to be due from Durant, and not greater than the penal sum named, was, under all the circumstances disclosed, a fraud in law upon him. If the attorneys of Hazard intended to obtain, by means of a bond, more than he was entitled to by such a bond as the writ

of *ne exeat* called for, and more than the court would ordinarily have given them, upon Durant's application to discharge the writ; if they intended to secure a bond that would make Griswold personally liable, within the penal sum, for any money decree passed against Durant, then a fraud was perpetrated upon him, which entitles him to relief; for, according to the decided preponderance of the evidence, it must be assumed that Hazard's attorneys knew that he signed the bond in the belief that, pursuant to the previous understanding, it was one to secure Durant's appearance, nothing more, and yet they failed to inform him, at the time, that it was drawn so as to impose upon him a much larger responsibility. Their silence upon that question was, under the circumstances, equivalent to a direct affirmation that the bond meant what Griswold supposed it did. In view of what passed at the jail on Saturday night, their duty was, by sufficient explanation, to correct the misapprehension under which he evidently labored. Besides, there can be no doubt, under the evidence, that the agreement to discharge the writ was reached without consultation with Griswold. No one of the witnesses states that he was consulted about that matter, or that he was informed as to the legal result of an agreement or order to discharge the writ. He testifies that he knew nothing of any such agreement. So, that, while Hazard's attorney, according to his evidence, was preparing a bond that would bind Griswold absolutely to pay any decree, not in excess of $53,735, that might be rendered against one who was almost a stranger to him, and who, Hazard stated in his bill, was then engaged in hazardous speculations and was in a precarious condition pecuniarily, he was, as the representative of Hazard, under an agreement with Durant, of which Griswold had no knowledge, that the writ of *ne exeat* should be discharged; thus compelling the surety to risk the insolvency of the principal, and putting it out of his power, for his own protection, to surrender the principal, and obtain the cancellation of the bond, as, in that case, the surety might have done, if the bond had been, as he supposed it was, one simply for the appearance of Durant. The concealment of this agreement from Griswold

was, under the circumstances, a wrong to him. "The contract of suretyship," says Mr. Story, "imports entire good faith and confidence between the parties in regard to the whole transaction. Any concealment of material facts, or any express or implied misrepresentation of such facts, or any undue advantage taken of the surety by the creditor, either by surprise or by withholding proper information, will undoubtedly furnish a sufficient ground to invalidate the contract." Again: "If a party taking a guaranty from a surety, conceals from him facts which go to increase his risk and suffers him to enter into the contract under false impressions, as to the real state of the facts, such a concealment will amount to a fraud, because the party is bound to make the disclosure." 1 Story's Eq. Juris: §§ 324, 215. To the same effect are *Franklin Bank* v. *Cooper*, 36 Maine, 180, 196; *Smith* v. *Bank of Scotland*, 1 Dow. 272, 292; *Railton* v. *Mathews*, 10 Cl. & F. 935, 943; *Small* v. *Currie*, 2 Drewry, 102, 114; *Phillips* v. *Foxall*, L. R. 7 Q. B. 666, 672; *Pidcock* v. *Bishop*, 3 B. & C. 605; Adams' Equity, § 179. But we do not rest our decision upon any ground of fraud in law or fraud in fact. We acquit the attorneys of Hazard of any desire or purpose to do injustice to Griswold, or to commit a fraud upon him. But we are constrained, by the settled rules of evidence, to hold, as already indicated, that their recollection of the circumstances under which the bond of August 24 was executed is materially at fault, and that the alleged mistake is established by convincing proof.

But it is said that Griswold was guilty of such laches in seeking the relief now asked, that he is not entitled to the aid of a court in equity. This position is based principally upon what Peckham says occurred between him and Griswold in the fall of the year after the execution of the bond. Peckham testifies: "About the last of October or the 1st of November, 1868, along that time, I met Mr. Griswold on Thames Street, in Newport, near my office. He spoke of this bond as if it were a bail bond. I said, 'No; it is a bond upon which you may be liable to pay money. If, for example, the court should find a judgment against Durant for any sum of money

and he did not pay it, you could be held for the amount named in these bonds.' He said, 'Well, I guess you are right, but I must see Durant about it. He must do something about it.' I asked him, 'Why, he is rich enough, isn't he?' and Mr. Griswold said, 'Yes; he is rich enough, but he is reckless, and there is no telling how long such a man may stay rich, and he must give me security.' I would like to add here that I mentioned this to Mr. Honey last winter. Mr. Honey said that he was confident, from conversations he had had with his client, Mr. Griswold, that Mr. Griswold had no recollection of any such conversation with me, and I replied that if Mr. Griswold did not recollect it I should hesitate about swearing to it, and that I did not think I would swear to it under those circumstances, and that certainly I would not like to do so. Still I have felt bound to state it here, upon further reflection with these explanations." If this be a correct statement of what passed between Peckham and Griswold, upon the occasion referred to, it is significant as showing that months after the bond was executed Griswold spoke of it as a bail bond. His declaration, after Peckham's explanation of its terms, "I guess you are right," naturally meant no more than a courteous acquiescence, without discussion, in the opinion expressed by one learned in the law. Griswold, while recalling the fact that he expressed to Peckham his belief that it was a bail bond, denies explicitly that he, on that or any other occasion, ever admitted that it was other than a bail bond.

Besides, there was no absolute necessity for Griswold's moving in the matter until after some decree was passed against Durant, and until an attempt was made to hold him personally responsible for the amount of the bond. He made an effort in *Griswold, Petitioner*, 13 R. I. 125, to be discharged from his bond upon the principal's placing himself within the jurisdiction of the court. But, as we have seen, the court, after declining to discharge the bond, said, that even if the bond in question was to be considered as having no other effect than a bond to abide the decree made upon hearing the cause, the petition for its discharge would not be considered by it until a final decree was passed. The judgment in that case

was passed September 30, 1880. Notwithstanding this announcement, and doubtless because of the intimation that the bond meant more in law than he supposed, Griswold commenced the present suit *more than a year before the decree was rendered against Durant, and before the action at law was brought on the bond.* Under the peculiar circumstances of this case we think the defense of laches is without substantial merit. Whether laches is to be imputed to a party seeking the aid of a court of equity depends upon the circumstances of the particular case. There are no circumstances here that would justify a refusal to grant the relief asked because of Griswold's delay in instituting suit to have the bond cancelled or reformed.

In the view the court takes of this case, the proper decree to make, if Durant were living, would be one reforming the bond of August 24, 1868, so as to make Griswold liable for the penal sum named only in the event that the principal failed to appear and become subject to the orders and decrees of the court in the suit in which the writ of *ne exeat* was issued. But such a decree would not now be appropriate. Under the circumstances, the only decree that will accomplish the ends of substantial justice is one perpetually enjoining the prosecution of any action, suit or proceeding to make him liable in any sum on or by reason of said bond.

We come now to the action at law, No. 53, in which there was a judgment against Griswold on the bond of August 24, 1868, for the sum of $66,470. It is assigned for error that the court sustained the demurrers to the original second, third, fourth and fifth pleas, ordered the amended third, fourth and fifth pleas to be stricken from the files, and denied the defendant's motions, at the trial, for judgment on his eighth and ninth pleas. It has been assumed in argument that the record in this case substantially presents among other questions, the following: 1. Whether the bond of August 24, 1868, was not obtained by such fraud and concealment as rendered it void as against Griswold? 2. Whether upon the face of the record of the equity suit in which the order or decree of December 2, 1882, was rendered, the court was not without

jurisdiction of the subject matter of that suit, the essential object of which, it is argued, was to administer the affairs, and distribute the assets, of a Pennsylvania corporation, by means of decrees and orders of a court in Rhode Island? 3. Whether simple duress operating only on the principal in the bond could be taken advantage of by the surety? 4. Whether the plaintiffs, notwithstanding the stipulation of Griswold's counsel, at the trial, that they were able to prove, under the decree of December 2, 1882, "an amount of damage in excess of the penal sum of the bond declared on," could maintain an action on the bond for that or any other sum, until it was ascertained and adjudged in Hazard's equity suit what distinct part, if any, of the $16,071,659.97 for which Durant was adjudged by the Supreme Court of Rhode Island to be accountable to the Crédit Mobilier of America, actually belonged, or would be ultimately awarded, to the obligees in the bond?

These questions have been argued by the counsel of the respective parties with signal ability, and their importance is recognized. But in view of the present condition of the record of this case, it is not deemed best now to discuss them. The ground upon which the court below ordered the amended pleas to be stricken from the files does not appear. It may be that the motion was treated as a formal demurrer (*Slocomb v. Powers*, 10 R. I. 255), or was granted, because, in the judgment of the court, the amended pleas did not materially change the defence as presented in the pleas to which special demurrers were sustained, and were not, therefore, fairly embraced by the stipulation made by counsel for their being filed. But, in our judgment, the amended pleas were much broader, as well as more specific in their averments, than were the original pleas; and the questions arising upon them could have been more appropriately raised by demurrer. *Smith v. Carrol*, 17 R. I. July 19, 1890. We are more willing to make this disposition of the case, because of the decision in case No. 50 in respect to Griswold's liability upon the bond sued on. In view of what has been there said, the discussion of the above questions would seem to be unnecessary.

The demurrer to the bill in No. 51 was properly sustained.

The error, if any, committed by the Supreme Court of Rhode Island in not allowing the release, executed to Durant by the receiver in the Pennsylvania court of the Crédit Mobilier of America, to be interposed as a defence in the suit brought by Hazard against Durant and others, could not be corrected by bill in equity, filed by a surety on the bond of August 24; for the reason, if there were no other, that the release was delivered prior to the judgment in the state court constituting the basis of the action at law on the bond.

The demurrer to the bill in case No. 52 was also properly sustained. In that case the validity of the proceedings in the Supreme Court of Rhode Island, by Hazard against Durant and others, was assailed upon the ground that the bill in that suit did not sufficiently show that any effort had been made by Hazard, the plaintiff therein, and who sued as stockholder, to procure corporate action against Durant by the Crédit Mobilier of America. It is only necessary to say that this ground presents only a question of mere error in the judgment of the state court, and does not affect its jurisdiction.

*The decree in suit No. 50 must be reversed, with directions to enter a new decree perpetually enjoining the defendants therein, and each of them, from prosecuting any suit, action or proceeding, against Griswold on the bond executed by him on the 24th of August, 1868, as one of the sureties of Thomas C. Durant; the decrees in cases Nos. 51 and 52 must be affirmed; and the judgment in the action at law, No. 53, must be reversed with directions for further proceedings not inconsistent with this opinion. Griswold is entitled to his costs in this court in cases 50 and 53, and the appellees in the other cases are entitled to their costs here as against Griswold. It is so ordered.*

MR. JUSTICE BROWN, dissenting, in No. 50.

I should have no hesitation in announcing my concurrence in the opinion of the court in this case, did it not seem to me to involve a disturbance of legal principles which I had supposed to be well settled and confirmed by repeated decisions of this court.

To entitle the plaintiff to a decree, he is bound to show, either mistake or fraud. I think he has failed to show either. There was nothing unprecedented — scarcely anything which could be called unusual — in the character of the obligation he assumed. The bond was such an one as is proper to be given to obtain the discharge of a defendant held upon a writ of *ne exeat.* In treating of this remedy, it is said in Daniell's Chancery Practice, that, " by the terms of the writ, the sheriff is to cause the party, personally, to come before him, and give sufficient bail or security in the sum indorsed on the writ, that he will not go, or attempt to go into parts beyond the seas, without leave of the court; and on his refusal, he is to commit him to the next prison." It is also said that, " the court will discharge the writ upon merits, whenever it appears, by the circumstances of the case, as disclosed by the affidavits upon which it was granted and the answer of the defendant, either that the plaintiff has no case, or that the defendant is not going out of the jurisdiction; and this it will do either absolutely or conditionally: that is, upon the defendant's giving security to abide and perform the decree of the court." 3d. Am. ed. 1814, 1817; 5th Am. ed. 1710, 1713, with some verbal changes; *Howden* v. *Rogers*, 1 Ves. & Beames, 129; *Atkinson* v. *Leonard*, 3 Bro. C. C. 218; *Roddam* v. *Hetherington*, 5 Ves. 91; *Parker* v. *Parker*, 12 N. J. Eq. (Beasley) 105; *McDonough* v. *Gaynor*, 18 N. J. Eq. (3 C. E. Green) 249.

In New York, it seems also to be the proper practice to discharge the writ upon the defendant's giving security to answer the plaintiff's bill, and to render himself amenable to the process of the court pending the litigation. *Mitchell* v. *Bunch*, 2 Paige, 606; *McNamara* v. *Dwyer*, 7 Paige, 239.

The writ in this case required Durant to give sufficient bail or security, in the sum of $53,735, " that he, the said Thomas C. Durant, will not go, or attempt to go, into parts beyond this State, without the leave of our said court." Durant was unwilling to give this security, because, as he said, it was imperatively necessary for him to leave the State and be in New York on the next Monday. It was, therefore, stipulated between his solicitor and that of the plaintiff, Hazard, that he

should file a bond, with surety in the penalty marked in the writ of *ne exeat*, "to abide and perform the orders and decrees of the court in said cause," and thereupon the writ of *ne exeat* should be discharged. These are the exact terms of the bond that was prepared and signed by the plaintiff. There is some conflict as to what took place upon the interview on Saturday night, at which it was agreed that the bond should be given. Plaintiff's witnesses assert that it was understood that a bond was to be given for his appearance before the courts when wanted. Upon the other hand, defendants' witnesses, Judge Bradley and Mr. Peckham, who, although outnumbered by the plaintiff's witnesses, were men of the highest character, members of the legal profession, and understanding thoroughly what they were about, swore that the nature of the proposed bond was freely discussed by Judge Bradley, Mr. Van Zandt, and Mr. Durant, and the fact that they were bonds which would hold the principal and sureties liable to pay money in case Durant should not perform any decree made by the court, was commented upon by them, Judge Bradley speaking for the defendants, and Mr. Van Zandt and Mr. Durant for themselves. The sureties were present, although it is not claimed that they took part in the discussion. I do not care, however, to attempt to reconcile this testimony, or to determine exactly where the truth lies. Griswold himself admits that, when the bond was prepared and submitted for his signature, he read it, and noticed the terms "abide by and perform the decrees of the court;" but, in the absence of any explanation, he inferred that it meant that Durant should appear and render himself subject to the processes of court. He does not complain that its contents or its legal effect were misstated to him, or that Judge Bradley or Mr. Peckham, who represented the plaintiff in the suit, misled him by any false representations as to its tenor or purport. He apparently refrained from asking any explanation of its meaning, but assumed himself to construe it, and gave it a different meaning from that which the law gave it. This, it seems to me, is a mistake of law, against which equity will give no relief. *Griswold, Petitioner*, 13 R. I. 125; *Hunt v. Rousmaniere*, 1 Pet.

1, 15; *United States* v. *Ames*, 99 U. S. 35, 46; *Hart* v. *Hart*, 18 Ch. D. 670; *Snell* v. *Insurance Co.*, 98 U. S. 85; 2 Pomeroy Equity Juris. sec. 843.

In *Powell* v. *Smith*, L. R. 14 Eq. 85, 90, the defendant endeavored to defeat the enforcement of an agreement to give a lease upon the ground that he was mistaken as to the legal meaning and effect of an important provision. The Master of Rolls in overruling the defence, said: " All those cases which have been cited during the argument are cases where there was either a dispute and doubt as to the thing sold, or where the words of the agreement expressed certain things in an ambiguous manner, which might be misunderstood by one of the parties. In all those cases the court has held that it must look at the evidence and that if the mistake is sufficiently proved the court will then set aside the agreement. But here the words of the agreement are quite certain, and the only thing that was not understood was the legal effect of certain words which it contained. Now, that is no ground of mistake at all. It is a question upon the construction of an agreement agreed to by everybody concerned."

In *Eaton* v. *Bennett*, 34 Beav. 196, a marriage settlement was drawn, as the intended husband alleged, in a manner contrary to the agreement; but before the marriage he knew its contents and executed it under protest, and reserved his right to set it aside. It was held that he could not, after the marriage, sustain a suit to rectify the settlement. The Master of Rolls observed that " the court, in such cases as these, only rectifies a settlement when both parties have executed it under a mistake, and have done what they neither of them intended. Here the plaintiff examined the draft and the settlement prior to its execution, and was perfectly aware of its purport. I think that he cannot set it aside or alter it in this court." Indeed, it is a doctrine familiar to this court, that in order to set aside an instrument for mistake it must appear that the mistake was mutual, and that one party is desirous of taking advantage of an error into which he himself in common with the other party has fallen. *Hearne* v. *Marine Ins. Co.*, 20 Wall. 488, 490; *Stockbridge Iron Co.* v. *Hudson Iron Co.*, 102 Mass.

45, 48; *Sawyer* v. *Hovey*, 3 Allen, 321; *German-American Ins. Co.* v. *Davis*, 131 Mass. 316.

In view of the stipulation that was entered into between the solicitors for the respective parties to this suit, I do not see how it can be claimed that there was any mistake upon the part of Bradley or Peckham as to the purport of the bond, and as before observed, unless they were parties to such mistake, there is no equity in reforming the instrument upon that ground. In addition to this the evidence must be such as to leave no reasonable doubt in the mind of the court as to the existence of such mistake, and in my view, without discussing it at length, the testimony in this case falls far short of the requisite certainty.

Again; it seems to me that the defence of laches is complete in this case. This bond was executed in August, 1868. It is shown that, as early as October or November of the same year, in a conversation between Mr. Peckham and the plaintiff in Newport, the character of this bond, as being distinct from a mere bail bond, was called to Mr. Griswold's attention by Mr. Peckham, who told him it was a bond upon which he might be liable to pay money. In Mr. Peckham's own words, he said: "If, for example, the court should find a judgment against Durant for any sum of money and he did not pay it, you could be held for the amount named in these bonds. He said, 'Well, I guess you are right, but I must see Durant about it. He must do something about it.' I asked him, Why, he is rich enough, isn't he? And Mr. Griswold said, 'Yes, he is rich enough, but he is reckless, and there is no telling how long such a man may stay rich, and he must give me security.'" It appears then from this testimony, which is practically uncontradicted, that within three months after the bond was given, the plaintiff was distinctly apprised that it was a bond for the payment of money. He appears to have done nothing about it, however, for twelve years; when he filed a petition in the Supreme Court of Rhode Island asking permission to surrender Durant into the custody of the court and be relieved from the bond — a petition which the court refused to grant. In this petition there was "no suggestion of any fraud, imposition, or

unfairness in obtaining it, practised by the complainants on the defendant or his sureties." *Griswold, Petitioner*, 13 R. I. 125, 126.

It was not until after this petition had been denied, and an opinion intimated that he might be bound to pay the penalty of the bond in the event of a decree against Durant, that he filed this bill, and for the first time set up that he had been imposed upon in the execution of the bond. In the meantime Durant has died and Hazard has lost whatever advantage he might have had in the surrender of his body in compliance with the bond which plaintiff says he understood was to be given in discharge of the writ.

I cannot avoid the impression that the present defence is an afterthought. In any view of the case, I think the plaintiff failed to exercise that decree of diligence which this court said in *Grymes* v. *Sanders*, 93 U. S. 55, was necessary to entitle a party to rescind upon the ground of mistake or fraud.

I think the decree of the court below is right and should be affirmed.

MR. JUSTICE BRADLEY and MR. JUSTICE BREWER did not participate in the decision of this case.