HYDE PARK INVESTMENT COMPANY, Appellant, v. GLENWOOD COAL COMPANY et al., Appellees.

**DEEDS:** Deed Without Reservation Following Town Plat Dedica-
1  tion with Reservation—Construction. The dedication of a city plat (Sec. 914 *et seq.*, Code 1897), containing an express reservation of all minerals underlying the tract, does not, *ipso facto* and as a matter of law, work an entire separation of the original fee into two new and distinct fees, to wit, (1) a fee to the surface and (2) a fee to the minerals, in the sense that a *conclusive* presumption arises that an interest in the surface only is conveyed by subsequent conveyances of the lots by ordinary deeds without reservation of minerals. No such presumption will be indulged. "Intention" remains the all important inquiry, and such intention will be sought out from all the facts and attendant circumstances, and enforced either (a) from the language of the deed itself, if possible, or (b) by reformation where the parties have been mistaken as to the legal effect of the language used. In instant case, held that a deed in the ordinary general form, and without any reservation of minerals, to the lots of an addition dedicated with express reservation of all minerals, was intended to carry the entire interest in the lots and would be enforced accordingly.

*Appeal from Polk District Court.*—HON. HUGH BRENNAN, Judge.

MONDAY, JUNE 21, 1915.

ACTION to recover damages on account of alleged trespass upon lands of the plaintiff and for injunctive relief. The

trial court found for the defendants and dismissed the bill and plaintiff appeals.—*Affirmed.*

*Cobb, Wheelwright & Dille,* and *N. E. Coffin,* for appellant.

*Clark & Hutchinson,* for appellees.

WEAVER, J.—On September 22, 1888, John Lyon and Ella M. Lyon, his wife, then being the owners of a tract of 100 acres of land in Polk county, conveyed it to the Hyde Park Investment Company, plaintiff herein, at the agreed price of $35,000. Of this price, $5,000 was paid in cash, the payment of the remaining $30,000 being secured by mortgage on the land. On December 21, 1888, the deed and mortgage were recorded, and on the same day, the investment company filed a map or plat of the land divided into 1,000 town lots. In the dedicatory statement accompanying the plat is the following expression of reservation: "The coal and mineral of all kinds underlying the entire tract embraced by this plat with the right to mine and remove the same is expressly reserved." We draw the inference from the record that the investment company was organized and incorporated for the purpose of handling this particular enterprise. The time did not prove ripe for the quick or easy disposal of the lots at a satisfactory profit. Some of the lots were sold and conveyed from time to time; but the title to a large portion of them remained in the plaintiff until lost by tax sale, or until the conveyance thereof to Mrs. Lyon by quitclaim, as hereinafter shown. Soon after the acquirement of the property, plaintiff made lease of the mining rights in the land, describing it as a part of the government survey without mention of the town plat, but no work was done under the lease and it was abandoned or canceled. The city of Des Moines seems to have raised some question about accepting or recognizing streets under which there was a reservation of mining

1. DEEDS: deed without reservation following town plat dedication with reservation: construction.

rights, and the company thereupon, in 1892, executed and filed with the county recorder a waiver or relinquishment to the public of all mining rights under the streets of Hyde Park. Little thereafter appears to have been done or accomplished by the company with reference to the property. John Lyon died, after reacquiring title to some of the lots from or through the grantees of the investment company and by tax deeds and sheriff's sales; and ultimately his widow, Ella M. Lyon (now Runkle), became vested in her own right and as guardian with all the rights or interests of which her husband died seized or possessed in the property which they had together formerly conveyed to the investment company. She also acquired a tax title to a large part of the lots. As owner, she applied to the court and obtained an order or decree vacating about one-half of the plat, and through tax deeds and otherwise, she acquired the ownership of all the property in controversy, unless we are to hold that all these conveyances vested her with title to the surface only, and that title to the coal under the surface remained in the investment company. It should also be said that the mortgage indebtedness had not been paid off or its lien discharged until the transaction of which we are about to speak.

With the title in the condition stated, Mrs. Lyon, for herself and as guardian, undertook, in the year 1902, to convey all the property which had been acquired by herself and John Lyon in the Hyde Park property to A. J. Gray. Gray also acquired title to other parts of the property, and later conveyed all his interests therein to Henry Gray, who is a defendant herein. The conveyance describes the property in part by reference to the government survey, in part by metes and bounds and in other part, by reference to the lots and blocks of the Hyde Park plat. In making the deal with A. J. Gray, objection was raised by him to Mrs. Lyon's title, and especially that it rested to a very considerable extent on tax deeds, it being feared that, as she held a mortgage lien on the property, her tax purchase and deed might be held

not sufficient to bar the right of the investment company to redeem therefrom. Negotiations were thereupon opened between Mrs. Lyon and the investment company to secure an adjustment which would remove this objection and thereby perfect or protect the title made to Gray. It was proposed, on behalf of Mrs. Lyon, to effect that purpose by foreclosure of her mortgage lien and sale of the property, and such proceedings having been begun, the investment company, desiring to avoid the possibility of a deficiency judgment upon which the holders of shares of unpaid stock might be held to individual liability, as well as to avoid liability for taxes which it had left unpaid, proposed or consented to quitclaim to Mrs. Lyon, and this arrangement was agreed upon. Pursuant thereto, the investment company made and delivered to Mrs. Lyon a deed, the body of which is in words as follows:

"KNOW ALL MEN BY THESE PRESENTS: That the Hyde Park Investment Company in consideration of the release of all personal obligations upon the notes or mortgages heretofore executed by said corporation to John Lyon *upon property in Hyde Park, an Addition to the City of Des Moines, Iowa,* do hereby QUIT-CLAIM unto Ella Lyon Runkle, formerly Ella Lyon, widow and sole heir of said John Lyon, deceased, all interest of every kind and nature *in said Hyde Park;* it being understood however that as to any purchasers of lots in said Addition who have assumed payment of any portions of any such mortgage or have bought subject to the same, that the said mortgage or mortgages shall remain a lien as against said purchasers upon their covenant or undertaking to pay same, or as a lien against the land purchased by them until so paid and may remain in full force and effect, as a lien or demand against any part of the said addition prior to any claim or demand of any lien holder against the said Hyde Park Investment Company, but no personal judgment shall be taken nor personal decree had in any event against the said Hyde Park Investment Company upon any such note or mortgage or any part thereof.

"This quit-claim being duly made in pursuance of the resolution of the Board of Directors of said Hyde Park Investment Company by its President and Secretary duly thereunto authorized."

About this time, A. J. Gray, the purchaser from Mrs. Lyon, entered into a written agreement with the Glenwood Coal Company, defendant herein, giving that company the exclusive right to mine coal under the land "previously known as the John Lyon farm or Hyde Park Addition," the consideration therefor to be paid in the form of royalty upon the product of such mine. Under this lease or agreement the coal company began at once to drill and prospect for coal, and in July or August, 1903, began to sink a shaft for the opening of a mine. In about three months, the shaft was completed, at which time the mine was equipped with engine, fan and other things necessary to be used in removing the coal. This preliminary work was done at an expense of nearly $20,000. The mine continued to be operated by the coal company from its opening in 1903 until this action was begun November 18, 1909, such operation being also continued pending this litigation. Neither Mrs. Lyon nor the Grays nor the coal company had any knowledge that the investment company had or claimed to have any rights in the property or in the coal under the surface after the making of the quit-claim deed until several years after the lease of the mining rights to the coal company in 1903, and after a very large amount of money had been expended in developing and operating the mine. The work was done openly; the officers of the investment company were residents of the city; and the testimony fairly tends to show that they knew the Glenwood Company was in possession and doing this work under the lease from Gray; and they neither objected thereto nor notified the company or Gray that they claimed any adverse interest in the premises for a period of several years and until shortly before bringing the action. In none of the

conveyances made by the investment company of lots in Hyde Park has there been any reservation of coal rights, unless such a reservation is to be implied from the language of the declaration upon the original plat.

The petition sets up the original purchase by which plaintiff obtained title to all the coal lying in place under its surface, and alleges that it has ever since been and still remains the absolute owner thereof. It alleges that the defendants have wrongfully and by force entered upon said property and mined ·and removed coal therefrom and have in fact severed, taken away and converted coal belonging to plaintiff to the value of $800,000, for which it demands a recovery.

The defendants answer severally, denying the allegations of the petition. They also allege a state of facts substantially as above stated and say plaintiff's alleged right of action is barred by the statute of limitations, and set up the conveyance to Mrs. Lyon and to Gray as having effectually vested the title to the lands, including the coal thereunder, in the defendant Gray, whose lease is the coal company's sufficient authority for opening and operating the mine. They also allege that the quit-claim deed made by the plaintiff to Mrs. Lyon in 1903 was intended and understood by the parties as effecting a re-conveyance to the grantee of the right and title and interest in the land which the investment company had formerly acquired from Mrs. Lyon and her husband; and·if the court finds that the said deed is not sufficient in form to operate as such a conveyance, the defendants ask for a reformation of the instrument to make it express the true intent of the parties. They also plead the conduct of the investment company in standing by and seeing defendants expend a large amount of time, labor and money in operating the mine, believing themselves to be entitled so to do, without any objection on plaintiff's part and without notice of any adverse rights, as grounds upon .which it ought to be estopped to assert any right hostile to those of the defendants.

After hearing the testimony, the trial court found that

the evidence was insufficient to sustain the claim sued upon and that the equities were with the defendants. It also found specially that the deed of 1903 by the investment company to Mrs. Lyon was intended to convey all the grantor's estate in the land, both in the surface thereof and in the coal underlying it.

If we were to take the record literally as printed and laid before us, we should have to hold that no appeal had been taken, for it is there said the notice was given on the "18th day of August, 1903." We pass this discrepancy, however, and assume that "1903" is a typographical error and that the date intended is 1913.

For the most part, the matters we have recited are without dispute in the record, and in so far as the other statements are the subject of controversy, we find the weight of the evidence fully justifies them.

I. The fundamental proposition upon which appellant bases its claim of right is that the form of the dedication, including, as it does, the expressed reservation of coal and mining rights works in a legal sense a severance of the surface of the land from the coal beneath, and that the plat was a mere platting or mapping of the surface, and the deeds thereafter made to lots in such plat conveyed title to the surface only, even though the deed itself makes no mention of the reservation.

Without at this time deciding whether, under our statute for laying out towns and additions thereto, it is competent for a landowner, who, theoretically at least, owns to the heart of the globe, to slice his holdings by imaginary horizontal cuts into multiple sections, one superimposed upon another down to the home of the terrestrial center of gravity, we think the abstract proposition contended for by appellant that a grantor may plat the surface only may readily be admitted for the purposes of this case, without affecting the result. Whether platted or not, it is, of course, within his power to convey the surface to one person and the mineral below the

surface to another, or he may convey either the surface or
the underlying mineral to one person and retain the remain-
ing part of the estate to himself. When the ownership is
thus divided, the estate in the surface and the estate in the
mine are severed, but we think it cannot be said that the mere
platting affects the nature or (if we may use that word) the
solidarity or integrity of the estate of the owner in the land
as one individual entity, except, perhaps, as his rights are
affected by the streets and public grounds which he has dedi-
cated to the public. After the plat is made and recorded,
he is still the owner of the property from the earth's center
*usque ad coelum* and he holds it by precisely the same title
as before, and he may still sell and convey the surface above
and the mine below together or separately, as he will. It
follows, we think, that if the owner of such a lot conveys
it by a description such as would be regarded as sufficient
to convey the entire title in ordinary cases unaffected by a
reservation, there is no conclusive presumption from the res-
ervation in the plat that his conveyance was executed, de-
livered and accepted with the understanding that it should
convey the surface right only. In other words, the grantor
owning both the surface and the mineral, and the deed upon
its face indicating no restriction or reservation, we see no
difficulty in giving it effect as a conveyance of the whole
statute if the evidence makes it clear that such was the intent
of the parties.

Referring now to the deed from the investment company
to Mrs. Lyon in 1903, we are of the opinion that upon the
record, it is not open to reasonable doubt that, for the con-
siderations therein mentioned, it was the intention of the
parties that the company should, so far as was then in its
power, re-convey to Mrs. Lyon all the property which it had
formerly acquired by the conveyance from her and her hus-
band while she, upon her part, released the company and its
stockholders from all personal liability for payment of the
mortgage debt and taxes. It is true that when this agreement

was made, the subject of coal and coal rights was not mentioned, but this only strengthens the conclusion which is so clearly pointed to by all the circumstances of the transaction, that all concerned were taking it for granted that a quitclaim from the company was all which was required to reclothe Mrs. Lyon and her grantee with the entire title. It is a preposterous suggestion that Mrs. Lyon, who had contracted to convey a good title to Gray and had entered into this negotiation for the express purpose of eliminating, if possible, any right or interest of the investment company and thereby making good her warranty to her grantee, would have released her debtors from all liability upon a very large indebtedness, simply to get a quit-claim which meant practically nothing, and leave the title she was trying to mend fatally defective. In closing the transaction, she employed the firm of Earle & Prouty, lawyers of ability and large experience, to protect her interests. Mr. Earle, as a witness, speaking of the negotiations in which he took part, says: "There was nothing said about the coal being reserved. My understanding was that we were getting everything the Hyde Park Company had there. I knew the company had purchased that property and that this was a purchase money mortgage. . . . I certainly would not have advised Mrs. Runkle to accept a quit-claim deed to the surface of the ground and satisfy her mortgage claim." Mr. Anderson, who represented Mr. Gray in seeking to have the title perfected, corroborates the testimony of Mr. Earle. Mr. Harding, who, as manager of the investment company, represented it in this matter, says: "The property we intended to convey was the property covered by the mortgage," and agrees that the inducement thereto was to avoid having a foreclosure sale, resulting in a deficiency judgment against his company, to avoid any proceedings against himself and others personally on account of their liability as stockholders, and to relieve Mrs. Runkle from the expense of foreclosure proceedings. In considering this branch of the case, there is another circumstance of some

value as a side light. The land conveyed by Lyon and his wife to the plaintiff was described in bulk as a one hundred-acre tract, while the mortgage given back to secure the purchase money describes the property as the lots and blocks of Hyde Park. So far as we have noticed, no witness attempts to explain this, but the circumstances point unmistakably to this explanation: The land was being bought with a small payment down, the remainder to be secured by mortgage; but under the statute, in order to make a valid platting into town lots, it must be certified that the land is free from incumbrance. Code, Sec. 915. It was, therefore, evidently arranged that the deed to the company should precede the mortgage long enough to enable the company to make and file its plat, and then the mortgage should go upon record describing the property in accordance therewith. The letter of the law was thus complied with, so far as record liens are concerned. Whether its spirit was violated, we need not inquire. Again we say it is quite incredible that Lyon, who was selling the entire property, both surface and mineral, should have taken this mortgage to secure six-sevenths of the entire purchase price with the belief or understanding that the lien of his security attached only to the surface of the property and left the underlying coal, constituting much the larger part of its value, free from all incumbrance in the hand of his grantee, a corporation which, so far as appears from the record, was without a single asset other than this property, upon which it had paid less than fifteen per cent of the agreed consideration. It is equally incredible that the company or its incorporators supposed or believed that they were getting any such advantageous bargain. These facts, with the attitude and conduct of the parties on both sides in this transaction and in the negotiations at the time of the reconveyance in 1903, the circumstances under which that reconveyance was made and its avowed purpose, and the otherwise incomprehensible silence and acquiescence on the part of plaintiff for years, in the presence of the known fact that Gray and his grantees

and lessees were openly exercising acts of ownership over the entire property, and mining, removing and marketing the coal in large quantities, constitute a most convincing array of evidence that, whatever may now be said or claimed as to the legal effect of platting the land with a reservation of this kind, all parties on both sides intended and understood that the mortgage lien attached to the entire property, both surface and mineral, and that the reconveyance in 1903 was intended to restore the entire property to Mrs. Lyon so far as the company was then able to do so. Indeed, we think it not an unfair conclusion, from the admitted facts, that neither the company nor its officers supposed or believed it had any remaining interest whatever in the property until shortly before this action was begun, when it may be presumed that someone made a discovery, not of the facts, for they had been known for years, but of a principle of law which, applied to those facts, might possibly give life and validity to a claim for damages to the amount of nearly or quite a million dollars. There is no evidence in the record that anywhere or at any stage of the dealings between the plaintiff and John Lyon or Mrs. Lyon was it ever mentioned or suggested that the mortgage lien was restricted to the surface of the land, and the claim now asserted to that effect rests for its foundation solely upon the assumption that, as a matter of law, the deeds and mortgages are to be read and interpreted with reference to the reservation in the plat. But it was competent for these parties to treat these instruments as having the effect which is usually and ordinarily given to instruments of that character, and this they clearly did. Such treatment is evidence of the mutual intention with which the instruments were made and delivered. It constituted one of the attendant facts and circumstances into which the court may always inquire, and if upon no rule of construction can the written contract be enforced according to the well-established intent of the parties, it will be re-formed accordingly. This rule is not confined to mere mistakes of fact; for it is well established in this state

that where the parties have been mistaken as to the legal effect of the language of their contract, a reformation will be or dered. *Hausbrandt v. Hofler*, 117 Iowa 103; *Goodrich v. Fogarty*, 130 Iowa 223; *Stelpflug v. Wolfe*, 127 Iowa 192.

Being thoroughly convinced that the legal effect which plaintiff now seeks to give its conveyance to Mrs. Lyon differs radically from the effect that both grantor and grantee intended at the time the deed was made, we hold that the claim so asserted cannot be equitably sustained and that the conclusion announced by the trial court ought not to be disturbed.

We will add that the same result might well be attained upon the issue of estoppel, but having found that the decree may be affirmed upon consideration of the general merits of the controversy, we do not prolong this opinion to set out or discuss the evidence bearing upon the alleged estoppel.

The decree of the district court is therefore—*Affirmed.*

Deemer, C. J., Evans and Preston, JJ., concur.