## SOUTHERN SURETY CO. v. UNITED STATES CAST IRON PIPE & FOUNDRY CO.

(Circuit Court of Appeals, Eighth Circuit.
May 18, 1926.)

No. 7153.

1. **Municipal corporations** ⧉347(2).

Contractor's bond, conditioned to indemnify city for pecuniary losses from breach of contract by contractor, was not statutory bond, within Rev. St. Mo. 1919, § 1040, and gave materialman no right to recover thereon.

2. **Municipal corporations** ⧉346.

"Statutory bond" given by one contracting with city is one that either literally or substantially meets requirements of statute.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Statutory Bond.]

3. **Reformation of instruments** ⧉18.

Subject to certain limitations, reformation may not be had on account of mistake of law.

4. **Reformation of instruments** ⧉19(1), 20.

Reformation may be had where parties have agreed on contract, but through mutual mistake, or mistake and fraud, have failed to express agreement intended in writing made.

5. **Reformation of instruments** ⧉45(1).

Proof of clearest and most satisfactory character is necessary to warrant reformation of instruments.

6. **Reformation of instruments** ⧉45(13).

Evidence *held* insufficient to warrant reformation of contractor's bond given city, so as to include provision protecting materialmen.

13 F.(2d)—53

Appeal from the District Court of the United States for the Western District of Missouri; Albert L. Reeves, Judge.

Suit by the United States Cast Iron Pipe & Foundry Company against the Southern Surety Company. Decree for plaintiff, and defendant appeals. Reversed, with instructions.

David A. Murphy, of Kansas City, Mo. (John T. Harding and R. C. Tucker, both of Kansas City, Mo., on the brief), for appellant.

Charles M. Miller, of Kansas City, Mo. (Roger S. Miller, of Kansas City, Mo., on the brief), for appellee.

Before SANBORN and LEWIS, Circuit Judges, and PHILLIPS, District Judge.

PHILLIPS, District Judge. This is a suit in equity to procure reformation of a surety bond and to recover upon the bond as reformed.

The facts are these:

On June 27, 1923, one F. M. Beeson, trading under the name of Beeson Machinery Company, entered into a contract with the city of King City, Mo., whereby he agreed to furnish all material, labor, and tools for the construction of a waterworks system in such city in accordance with certain plans and specifications. The material portions of the contract, which was in the form of an accepted proposal, read as follows:

"We, the undersigned, respectfully submit our proposal for the furnishing of all material, labor, tools, and miscellaneous items of every description necessary for the proper construction and completion of the herein specified waterworks system, as given on the plans and in the specifications. * * *

"It is hereby agreed that the accompanying 5 per cent. certified check shall be returned to the bidder at the letting, if bid is not accepted, and if bid is accepted upon submission of a satisfactory surety bond in an amount equivalent to 100 per cent., covering the construction of the work and the payment of all bills in connection with same. * * * *"

The specifications referred to in the contract contained the following provisions:

"A surety company bond, assuring the faithful performance of the contract will be required in a sum equal to 100 per cent. of the contract price. This bond shall be filed with the municipality until the work has been entirely completed and three months' satisfactory operation has been secured, after which

the bond shall be returned to the contractor. The bond shall include a provision for the protection of mechanics, laborers, and persons furnishing material for the construction of public improvements."

On June 27, 1923, J. J. Higgins, a representative of the Southern Surety Company, secured from Beeson an application for, a surety bond to be given in connection with the above contract. Higgins asked Beeson if the city had any special form of bond. Beeson replied: "No; use your own form." Beeson advised Higgins that the exact amount of the contract had not then been determined, and that the bond should be made for the sum of $50,000. Higgins prepared the bond, and it was duly executed by Beeson and the surety company. Thereupon, Beeson and Higgins went to the city hall, at King City, to deliver the bond. The provisions of the bond material to this inquiry read as follows:

"Whereas, said principal has entered into a certain written contract with the obligee, *providing for the furnishing of all labor and material necessary for the installation and completion of waterworks improvements in accordance with plans and specifications prepared by E. T. Archer & Co., engineers, which contract together with plans and specifications are made to form a part of this bond the same as though copied at length herein*:

"Now, therefore, the condition of the foregoing obligation is such that, if the said principal shall well and truly indemnify and save harmless the said obligee from any pecuniary loss resulting from the breach of any of the terms, covenants, and conditions of the said contract on the part of the said principal to be performed, then this obligation shall be void; otherwise, to remain in full force and effect in law."

Rufus H. Limpp, called as a witness for the plaintiff, testified: That he was mayor of King City when the contract with Beeson was entered into; that the bond was executed by Beeson for the Beeson Machinery Company, and by Higgins for the surety company, and that Higgins delivered the bond to the clerk of King City at a meeting of the board of aldermen of the city. Limpp further testified that he asked Mr. Archer, the engineer for the city, "Is this the kind of a bond called for in the contract?" and that Archer replied, "It is the usual form of bond." He testified further, "Higgins stated that it was the kind of bond required in the contract, and, to absolutely satisfy us that it was, he would write in the bond that it complied with all the terms of the contract," and that Higgins wrote into the bond the provision italicized in the above quotation from the bond. On cross-examination he testified: "I don't know whether I saw him write that provision in, but I remember the agreement very distinctly. I wouldn't say that Mr. Higgins said a word to me."

Askins, one of the aldermen, testified, that Limpp asked Archer "if it was a legal bond to cover the contract," and that Archer said "he thought it was," and that then Higgins wrote some further provisions into the bond. Askins identified such provisions, and then testified further as follows: "That was written in after the objection was made. The objection was about covering the materialmen."

Archer, the engineer, testified: "Limpp took the bond, and read it over to me, and asked me if it was all right. I told him that it was in the usual form, but that it didn't tie up sufficiently with the specifications. It didn't have any particular reference to the specifications, and I suggested that there be written in it a reference to the specifications, and I dictated approximately what was written in, and Mr. Higgins wrote it in. The specifications which I had in mind were the specifications covering the work—a clause which says they have to guarantee the work, and a clause that says they have to be responsible for the payment of the bills. * * * He [Higgins] said, 'All right, we will write in there whatever you say;' and I dictated practically what was put in there, and he wrote it in at that time. He might have changed a word or two."

Mr. Higgins, the agent for the surety company, testified: "Nothing whatever was said to me about the question as to whether or not the bond complied with the contract. Up to the time I left King City, I had never seen a copy of the contract. On June 29, 1923, the engineer, Mr. Archer, sent me a copy of the contract. Up until the time I received that copy from Mr. Archer, I had never read it, never had it in my possession, and never heard it read by anybody else. * * * At the time the bond was executed, I did not know that there was any law in the state of Missouri requiring a contractor to give a bond for the protection of materialmen and laborers. I knew there was a specific form of bond in Kansas covering labor and material bills, a bond which was made to the state and filed with the district court, but I never heard of a bond covering labor and material bills being filed in Missouri."

Beeson undertook the performance of the contract. In January, 1924, he abandoned

the work. The city notified the surety company of Beeson's default, and the surety company completed the contract.

The United States Cast Iron Pipe & Foundry Company (hereinafter called the United States Company) sold to Beeson certain pipes and castings for use in the construction of the waterworks plant, for which Beeson agreed to pay $22,609.81. Beeson paid only $6,719.89 of this amount. The United States Company brought this suit against Beeson, the surety company, and King City, to procure a reformation of the bond and to recover the balance due for the materials furnished to Beeson.

The trial court reformed the bond, by adding after the named obligee, the city of King City, Mo., the following: "And any person entitled to claim protection under this bond" —and by adding to the condition of the bond the following: "And said principal shall also well and truly make payment to persons and materialmen furnishing material used in the construction, installation and completion of the waterworks improvements in accordance with the written contract and plans and specifications above referred to," and gave judgment against the surety company and in favor of the United States Company for the balance due it for materials furnished Beeson. From such decree, the surety company has appealed.

The contentions of the surety company are, first, that the bond is not a statutory bond; second, that the bond is a common-law bond, made solely for the benefit of King City, and not for the benefit of the United States Company, and that the United States Company has no rights thereunder; third, that the United States Company is neither a party to the contract nor in privity with a party thereto, and cannot have reformation of the bond; fourth, that the evidence failed to show a mutual mistake, or a mistake on the part of the city and fraud on the part of the surety company; and, fifth, that if any mistake was shown it was a mistake of law, which affords no ground for reformation.

[1] The United States Company contends, first, that the bond was a statutory bond, and that it was entitled to recover thereon without reformation; and, second, that if reformation was necessary it was entitled to have the bond reformed.

Section 1040, R. S. Mo. 1919, provides:

"It is hereby made the duty of all officials, boards, * * * of any * * * city, * * * in making contracts for public work, * * * to require every contractor for such work to execute a bond to the * * * city, * * * with good and sufficient sureties, and in an amount to be fixed by said officials, * * * and such bond, among other conditions, shall be conditioned for the payment of material used in such work and for all labor performed in such work, whether by subcontractor or otherwise."

[2] A statutory bond is one that either literally or substantially meets the requirements of the statute. City of Mt. Vernon v. Brett, 193 N. Y. 276, 86 N. E. 6, 10; Stephenson v. Monmouth M. & M. Co. (C. C. A. 6) 84 F. 114, 28 C. C. A. 292; Johnson v. Erskine, 9 Tex. 1; Traweek v. Heard, 97 Ala. 715, 12 So. 166; La Crosse Lbr. Co. v. Schwartz, 163 Mo. App. 659, 147 S. W. 501. The Missouri statute required the board of aldermen of King City to take a bond "conditioned for the payment of material used in such work and for all labor performed in such work, whether by subcontractor or otherwise." The bond in the instant case was not so conditioned, either literally or substantially. It was not even conditioned for the performance of the contract, but only to save the city harmless from pecuniary loss resulting from a breach of the contract on the part of the contractor. The city could suffer no pecuniary loss through the failure of the contractor to pay for materials, because no obligation rested on the city to pay for such materials.

To support its contention that the bond in the instant case is a statutory bond, the United States Company relies upon the cases of Fogarty v. Davis, 305 Mo. 288, 264 S. W. 879, and Dupont de Nemours Powder Co. v. Culgin-Pace Contracting Co., 206 Mass. 585, 92 N. E. 1023.

In Fogarty v. Davis, supra, the contract contained, among others, the following provision: That "the contractor shall and will provide all materials and perform all the work for the erection and completion of a high school building, and such other work as set forth in the specifications for same." That provision of the contract required the contractor both to furnish and pay for the labor and material. American Bonding Co. of Baltimore v. Pueblo Investment Co. (C. C. A. 8) 150 F. 17, 80 C. C. A. 97, 9 L. R. A. (N. S.) 557, 10 Ann. Cas. 357; McKenzie v. Board of School Trustees, 72 Ind. 189, 196; Mayes v. Lane, 116 Ky. 566, 76 S. W. 399, 400. In referring to the conditions of the bond the Missouri Supreme Court said:

"It is conditioned that Mann shall perform all his contract obligations and shall keep the 'obligee harmless and indemnified

from and against all and every claim, demand, judgment, lien, cost, and fee of every description, * * * and shall repay said obligee all sums of money said obligee may pay to other persons on account of work and labor done or materials furnished on or for said contract,' and shall pay all damages or forfeitures sustained for any reason by the principal's failure properly to execute his contract. These conditions are long, but this is a sufficient epitome for present purposes."

Thus it will be seen that the condition of the bond was that the contractor should perform all his contract obligations. Since the bond was conditioned for the performance of the contract, and the contract obligated the contractor to furnish and pay for the materials, the bond, though not in form, was, in substance, what the statute required, and it gave to third persons who furnished materials to the contractor a right of action on the bond if the contractor failed to pay for such materials. Knight & Jillson Co. v. Castle, 172 Ind. 97, 87 N. E. 976, 27 L. R. A. (N. S.) 573, note at page 588. The Supreme Court of Missouri held that the parties intended to give a bond in compliance with section 1040, supra, and that the bond given was such a substantial compliance therewith as to constitute it a statutory bond, and that where the contractor failed to pay subcontractors, the latter could maintain a suit on the bond to recover the amounts due them.

But the Fogarty Case is clearly distinguishable from the instant case. Here the bond was not conditioned for the performance of the contract, but only to save the city harmless from pecuniary loss resulting from a breach of the contract on the part of the contractor. Manifestly the city could suffer no pecuniary loss due to the failure of the contractor to pay for materials, because there was no obligation on the part of the city to pay for such materials.

In Dupont Co. v. Contracting Co., supra, the contracting company entered into a written contract with the city of Springfield to build certain public works for the city. The Dupont Company furnished certain materials to the contracting company for which the latter failed to pay. By the terms of the contract, the contracting company agreed "to furnish sufficient security by bond or otherwise for payment by the contractors and subcontractors for labor performed and furnished, and for materials used in said construction in accordance with the provisions of the act of 1904, chapter 349." The contracting company furnished a bond running to the city which contained the following provision:

"And the said principal and sureties hereby further bind themselves, their successors, heirs, executors, and administrators, jointly and severally, to repay to said city any sum which said city may be compelled to pay to any contractors or subcontractors for labor performed or furnished, and for materials used in such construction under the provisions of Acts 1904, c. 349."

The statute referred to requires public officers to take sufficient security for the payment by the contractor on public work for labor performed and materials used in carrying out the contract. The Dupont Company sought recovery upon the bond against the contracting company and its surety for the materials furnished. The Massachusetts court held that the provisions of the statute were incorporated in and made a part of the bond by the reference made thereto in the bond, that the bond was given for the purpose of complying with the provisions of the statute, that it substantially met the requirements of the statute, and that the Dupont Company was entitled to recover on the bond.

In the Dupont Company Case, the provisions of the bond, which, by reference, incorporated the provisions of the statute, evinced a clear intent to provide the security required by the statute and the bond substantially met the requirements of the statute. On the contrary, in the instant case, there is nothing in the bond to indicate that the parties intended to comply with the provisions of the Missouri statute (section 1040, supra), and the bond neither actually nor substantially conformed to the requirements of the statute.

We therefore conclude that, without reformation, the bond in the instant case was conditioned solely for the benefit of King City, and gave no right to the United States Company to recover thereon the balance due on account of materials furnished by it to Beeson.

It becomes necessary therefore to determine whether or not the United States Company was entitled to a reformation of the bond. It is clear that there was no mistake as to the mere words of the bond. The bond as originally prepared was presented to the city board by Beeson and by the representative of the surety company. It was read aloud by the mayor, and he inquired of the city engineer whether it was the kind of a bond called for in the contract. The engineer suggested a modification, which the surety company, through Higgins, agreed to, and the same was written into the bond. If any mistake was made, it was in failing to express the contract agreed upon and intended by the

parties, due to mistake in the legal import of the language employed to express such agreement.

[3-5] It may be stated as a general rule that reformation may not be had on account of a mere mistake of law, but to this general rule there are certain well recognized limitations. A court of equity may grant relief where the parties having agreed to the terms of a contract, through a mutual mistake, or through a mistake of one and fraud of the other, in reducing the contract to writing, fail to express the contract agreed upon and intended, but such mistake or fraud must be established by proof of the "clearest and most satisfactory character." Philippine Sugar Estates Development Co. v. Government of the Philippine Islands, 247 U. S. 385, 38 S. Ct. 513, 62 L. Ed. 1177; Griswold v. Hazard, 141 U. S. 260, 11 S. Ct. 972, 999, 35 L. Ed. 678; Snell v. Atlantic F. & M. Ins. Co., 98 U. S. 85, 25 L. Ed. 52; Walden v. Skinner, 101 U. S. 577, 583, 25 L. Ed. 963; Hunt v. Rousmanier's Adm'rs, 21 U. S. (8 Wheat.) 174, 5 L. Ed. 589; Skidmore v. Stewart, 199 Ala. 566, 75 So. 1; Bailey v. Lisle Mfg. Co. (C. C. A. 8) 238 F. 257, 152 C. C. A. 3; Teig v. Linster, 150 Minn. 111, 184 N. W. 609; Marine Savings Bank v. Norton, 160 Mich. 614, 125 N. W. 754; Hyde Park Investment Co. v. Glenwood Coal Co., 170 Iowa, 593, 153 N. W. 181; Hausbrandt v. Hofler, 117 Iowa, 103, 90 N. W. 494, 94 Am. St. Rep. 289; Godwin v. Da Conturbia, 115 Md. 488, 80 A. 1016; Harris v. Columbiana County Mutual Ins. Co., 18 Ohio 116, 51 Am. Dec. 448.

In the case of Griswold v. Hazard, supra, Griswold, who was a surety on a bond in which Hazard was one of the obligees, sought to have the bond reformed on the ground of mistake. The Supreme Court, in passing on the right to have the bond reformed, said:

"There was no mistake as to the mere words of the bond; for it was drawn by one of Hazard's attorneys, and was read by Griswold before signing it. But, according to the great weight of the evidence, there was a mistake, on both sides, as to the legal import of the terms employed to give effect to the mutual agreement. In short, the instrument does not express the thought and intention which the parties had at the time of its execution. And this mistake was attended by circumstances that render it inequitable for the obligees in the bond to take advantage of it. The instrument was drawn by one of Hazard's attorneys, and was presented and accepted as embodying the agreement previously reached. Griswold was unskilled in the law, and took

the word 'perform' as implying performance in the sense of Durant's becoming amenable to the process of the court. He had no reason —unless the recollection of Gray, Durant, Van Zandt, and himself as to what occurred is wholly at fault—to doubt that the bond expressed the real agreement, especially if he heard Van Zandt's statement to Durant, when the latter was about to sign the bond, that it 'was, in effect, a bail bond.' A court of equity ought not to allow that mistake, satisfactorily established and thus caused, to stand uncorrected, and thereby subject a surety to liability he did not intend to assume, and which, according to the decided preponderance of the evidence, there was at the time no purpose to impose upon him. While it is laid down that 'a mere mistake of law, stripped of all other circumstances, constitutes no ground for the reformation of written contracts,' yet 'the rule that an admitted or clearly established misapprehension of the law does create a basis for the interference of courts of equity, resting on discretion *and to be exercised only in the most unquestionable and flagrant cases,* is certainly more in consonance with the best-considered and best-reasoned cases upon this point, both English and American.' " (Italics ours.)

In the case of Snell v. Insurance Co., supra, the court said:

"We have before us a contract from which, by mistake, material stipulations have been omitted, whereby the true intent and meaning of the parties are not fully or accurately expressed. A definite, concluded agreement as to insurance, which, in point of time, preceded the preparation and delivery of the policy, is established by legal and exact evidence, which removes all doubt as to the understanding of the parties. In the attempt to reduce the contract to writing there has been a mutual mistake, caused chiefly by that party who now seeks to limit the insurance to an interest in the property less than that agreed to be insured. The written agreement did not effect that which the parties intended. That a court of equity can afford relief in such a case is, we think, well settled by the authorities. * * * *Of course parol proof, in all such cases, is to be received with great caution, and, where the mistake is denied, should never be made the foundation of a decree, variant from the written contract, except it be of the clearest and most satisfactory character."* (Italics ours.)

In Philippine Sugar Co. v. Government, supra, the court said:

"The burden of proof * * * cannot be

satisfied by mere preponderance of the evidence. It is settled that relief by way of reformation will not be granted, unless the proof of mutual mistake be 'of the clearest and most satisfactory character.'"

In Bailey v. Mfg. Co., supra, this court said:

"The jurisdiction of a court of equity to reform a written contract for mutual mistake, or for mistake on one side and fraud, deceit, or inequitable conduct on the other, is indisputable. But the purpose of a written contract is to furnish a record of the terms of the agreement of the parties not easily impeached, and thereby to avoid subsequent disputes and conflicting testimony and claims regarding its terms and their meaning. To accomplish this purpose, and to prevent such disputes from annulling written agreements, two rules have been firmly established in equity: First, that the burden is on the complainant to prove the mutual mistake, or the mistake of one party and the deceit, fraud, or inequitable conduct of the other, upon which he relies for a modification or avoidance of the contract; and, second, that in view of the written record of the terms of the agreement made at the time a preponderance of the evidence is insufficient, and nothing less than evidence that is plain and convincing beyond reasonable controversy will constitute such proof as will warrant a modification or reformation of a written agreement."

[6] Did the proof in the instant case measure up to the rule? On direct examination, Limpp testified that he asked Archer if the bond was the kind called for in the contract, and that Archer replied, "It is the usual form of bond," and that Higgins stated "that it was the kind of bond required in the contract, and, to absolutely satisfy us that it was, he would write in the bond that it complied with all the terms of the contract," and that Higgins then wrote into the bond the portion italicized. However, on cross-examination, Limpp testified: "I don't know whether I saw him write that provision in, but I remember the agreement very distinctly. I wouldn't say that Mr. Higgins said a word to me." Askins testified that the provision was written into the bond after objection was made, and that the objection was about protecting the materialmen. He gave, however, his conclusions rather than the substance of what was said, and the facts to which he testified did not show clearly that the parties agreed that the bond should be conditioned for the payment of materialmen. Archer testified that the modification made in the contract was the addition of the following words: "Which contract, together with the plans and specifications, are made to form a part of this bond, the same as though copied at length herein." He said that he requested such change because he did not think the bond was "hooked up enough with the contract and the specifications." The language employed by Archer in modifying the bond would serve the purpose he had in mind, when he said he wanted to tie the bond up more specifically with the contract and specifications, but it was quite foreign to the question of protecting materialmen. If in employing this language the parties had in mind the protection of materialmen, it seems quite peculiar that they did not use language calculated in a degree at least to accomplish that purpose.

Higgins testified that, at the time the bond was executed and delivered, he had not seen the contract, did not know that it contained a provision requiring the contractor to give a bond to protect materialmen, and did not know that such a bond was required by the statutes of Missouri, and that nothing was said to him about the question as to whether or not the bond complied with the contract or protected materialmen.

From the foregoing it will be seen that all that was clearly established by the evidence is that, when the bond was presented, the mayor inquired of the city engineer whether the bond complied with the requirements of the contract, and that the engineer answered that it was the usual form, but did not tie up sufficiently with the contract and specifications, and suggested the addition of the language which was written into the bond at his dictation. There was no showing that Higgins knew the contract contained a provision requiring a bond to protect materialmen. There was no showing that the minds of the parties clearly met upon an agreement that the bond should be conditioned for the payment of material used in the work. There was no showing by evidence of the "clearest and most satisfactory character" that the language of the contract deliberately used and dictated by the representative of the city, and not by the surety company, failed to express the true intent or meaning of the contract theretofore agreed upon between the city and the representative of the surety company.

While there are some vague suggestions in the evidence that the additional provisions were written into the bond, after it was presented, for the purpose of affording protection to laborers and materialmen, it falls far short of measuring up to the standard laid

down by the Supreme Court, to wit, evidence of the "clearest and most satisfactory character." To permit a party to enlarge the obligations of a solemn written contract, deliberately entered into, by the character of parol proof relied upon in this case, would destroy the sanctity of written contracts, and set at naught the very purpose which actuates honest persons when they reduce the terms of their contract to written form. We accordingly conclude that the evidence in this case did not warrant the court in granting reformation of the bond. It becomes unnecessary to pass upon the other contentions urged by the surety company.

For the reasons above stated, the decree of the lower court is reversed, with instructions to enter judgment in favor of the surety company; and it is so ordered.