HENRY FLOBERG, Appellee, v. C. E. T. PETERSON, Appellant, et al.

No. 40958.

. APRIL 5, 1932.

REHEARING DENIED SEPTEMBER 30, 1932.

Lester L. Orsborn and Addison G. Kistle, for appellant.

Ferguson & Ferguson and Clifford Powell, for appellee. ·

KINDIG, J.—August Floberg came from Sweden to America, and by pursuing a course of hard labor and economy was finally

enabled to buy a quarter section of land in Page County. This is the land involved in the present controversy.

Mr. Floberg was married twice. As the fruit of the first marriage, two children were born. They are Mrs. Alice Floberg Lantz and the plaintiff-appellee Henry Floberg. The first wife died when the appellee was six and his sister Alice two years of age. Later, the father, August Floberg, married the second time. On the second occasion he was married to Emma C. Floberg, whose estate is involved in the present proceeding. After the second marriage, August Floberg and his new wife, together with the two children from the first wife, went onto the farm above named, whereon they built a new home. Emma C. Floberg, the second wife, loaned her husband $3,000 for the purpose of constructing the necessary buildings. That money, however, was later repaid to Emma C. Floberg by her husband August Floberg. Prosperity smiled upon August Floberg, and when he died, in 1916, he owned not only the land, but also a large amount of personal property.

In his will August Floberg conveyed all his property, both real and personal, to his surviving wife, Emma C. Floberg, for the purpose of taking care of herself and the two children until the appellee reached the age of twenty-five years, at which time the estate was to be divided between the widow and the two children in accordance with the law of distribution. According to the record, August Floberg, when he died, left to his wife and children the land above named, with the necessary machinery, stock, and grains kept thereon, and in addition thereto he bequeathed to them approximately $22,000 in notes and securities.

At first Emma C. Floberg, the widow, and the two children remained upon the farm and carried on the work. Thus the matters rested until 1922, when the two children purchased the widow's interest in the land. This purchase was made upon the theory that the value of the widow's one-third interest approximated $15,500. Accordingly appellee and his sister executed to the widow their note for $15,500, secured by a mortgage on the land. Such purchase of the widow's interest in the land seems to have included her portion of the stock, machinery, grains, etc. No division, however, was made of the $22,000 in notes and securities.

Following the purchase of the widow's interest, appellee and

his sister moved onto the farm and conducted the business until 1924, when, in the manner and way hereinafter explained, the appellee purchased his sister's interest in the land. Upon appellee's marriage, it became apparent to him and his sister that the happiness of each would be conserved if they lived in separate homes. During the father's lifetime, he explained to the second wife, Emma C. Floberg, his desire that the appellee should some day have the farm. That apparently was in harmony with an old country custom. The second wife was very much impressed with this thought, and after her husband's death it became her purpose to bring about her late husband's wish. So, when appellee and his sister talked of separating, the widow commenced to promote her late husband's plan. She advised appellee to buy his sister's interest in the farm, but appellee refused. His objection to the purchase was that he could not afford to do so, and the land was not worth the price demanded. Manifestly it was appellee's plan to buy eighty acres of land in another farm in order that he might finance the proposition. However, the widow continued to insist, and asked the aid of neighbors in her endeavor to persuade appellee to buy his sister's interest in the home farm. Finally, the widow is said to have informed appellee that she would finance the purchase of the sister's interest on the basis of $23,000. This sum the sister was willing to accept.

It is claimed by appellee that the widow offered to permit him to have the sum of $23,000 for this purpose, provided he would pay her five per cent interest thereon during her life, pay the taxes on the farm, and keep the place well improved. At the widow's death, under this scheme, the principal was not to be collectible. The plan was to provide an annuity for the widow during her life. Appellee yielded, and accepted the proposition. Accordingly, settlement was made. As before said, the $22,000 in moneys and credits had not been distributed. Each of the children, as well as the widow, had a one-third interest therein. Hence the children transferred to the widow their two-thirds interest in the moneys and credits, amounting to approximately $15,000, and raised the balance necessary to satisfy the $15,500 mortgage and note which they had given her for the purchase of her one-third interest in the land. Consequently, the appellee and his sister then owned the land free and clear of all incumbrances,

and the widow had all the notes and securities, amounting to approximately $22,000. In order, then, to finance the appellee in his purchase of his sister's one-half interest in the farm, the widow transferred to the sister the $22,000 in notes and mortgages, and apparently paid the balance of the consideration in cash. Under the plan, the sister, as part of the same transaction, conveyed to her brother her one-half interest in the farm.

After the transaction was completed, then, the sister had the notes and securities, and appellee held the farm. Therefore, in order to satisfy the widow in accordance with the above-mentioned plan which she proposed to appellee, she was to receive from appellee interest at the rate of five per cent per annum on $23,000 during her natural life, but, as before said, the principal was never to be paid. Appellee, in addition thereto, was bound to pay the taxes and keep up the improvements on the land. Someone advised that the widow's contract with appellee should be reduced to writing. A lawyer was suggested, but the parties concluded to go to a near-by banker, who drew a note and a mortgage securing the same, covering the land in question. The note and mortgage were dated March 1, 1924, and both were signed by the appellee and his wife. Emma C. Floberg, the widow, is named as the payee of the note and the mortgagee in the security contract. This note is for the principal sum of $23,000, payable March 1, 1934, together with interest at the rate of five per cent per annum, payable annually. Nothing, however, is said in either the note or mortgage that the principal is not to be paid. Following the transaction, the sister and her husband left the old home and went onto another farm in Cass County. Sometime in 1925, the widow also left the home farm and purchased a house in Red Oak, where she thereafter lived until her death, in October, 1928. She left a will naming her brother, the defendant-appellant, C. E. T. Peterson, as her sole beneficiary.

Upon qualifying as the executor of the will, the appellant insisted that appellee pay the aforesaid $23,000 note. Appellee objected, on the theory that the note and mortgage securing it were merely evidence of an oral annuity agreement, under which the late Emma C. Floberg was to receive five per cent per annum on $23,000, according to the aforesaid oral agreement. Failing to reach a settlement, the present suit was commenced by appellee: First, to reform the note and mortgage to correspond with the

1368

said oral agreement; and, second, to quiet the title in himself to the foregoing real estate on the theory of the aforesaid oral contract with Emma C. Floberg. After a trial in the district court, that tribunal reformed the note and mortgage in accordance with the prayer of appellee's petition, and quieted the title in him to the real estate, subject to his paying to appellant, however, $675, being the unpaid interest on the aforesaid $23,000 from March 1, 1928, to October 14, 1928, the date of Emma C. Floberg's death. From the judgment and decree thus entered, the appellant appeals.

On this appeal, the appellant declares that appellee should not have been permitted to prove the alleged oral contract with Emma C. Floberg because the evidence offered violated the parol evidence rule. Likewise, it is said by appellant that appellee's own testimony violated not only the parol evidence rule, but also the so-called dead man's statute. Our discussion of the case proceeds upon the theory that the testimony of the appellee is eliminated. That being true, was it proper for the appellee to prove by other witnesses his alleged oral contract with the late Emma C. Floberg? Such proof is admissible, appellee contends, upon either of two theories: First, to show that the $23,000 note and mortgage were conditionally delivered, or delivered for a special and limited purpose; and, second, to show that through mistake the note and mortgage do not express the true intention of the parties. Pursuing his argument at this point, appellee declares that a conditional delivery of a promissory note or a delivery thereof for a specified and limited purpose may be shown by parol evidence. As authority for this proposition, he cites, among other cases, Oakland Cem. Assn. v. Lakins, 126 Iowa 121; Ball v. James, 176 Iowa 647; and Herron v. Brinton, 188 Iowa 60.

Under our theory of the case, we find it unnecessary to discuss the question whether oral evidence was admissible to show a conditional delivery or a delivery for a certain or specific purpose. Regardless of whether the oral evidence is admissible for the purposes just mentioned, the same was properly introduced by appellee in the case at bar because he is seeking a reformation of the note and mortgage. Hausbrandt v. Hofler, 117 Iowa 103, and Lee & Jamieson v. Percival, 85 Iowa 639, 641. For the pur-

pose of illustrating the thought, an excerpt is here quoted from Hausbrandt v. Hofler (117 Iowa 103), reading on page 105:

"So, too, the rule of evidence which forbids oral testimony to contradict or vary the terms of a written contract has no application to proceedings in equity, where a mistake in the contract is alleged, and its reformation demanded. The right to reform a written contract at all implies, of necessity, the right to dispute its terms, and to show (ordinarily by parol) that its stipulations do not express the real intention of the parties."

When a reformation of written instruments is thus sought, the evidence of an oral agreement may be introduced to show: First, mutual mistake of the parties in selecting the form of written instruments adopted to carry out the mutual understanding; or, second, a mutual mistake in the phraseology adopted in the writings, which therefore fails to correctly express the true intention of the parties. Of course, it is true that equity will not grant relief to correct certain mistakes of law. For instance, it is said in Stafford v. Fetters, 55 Iowa 484, reading on page 486:

"* * * where two are bound by a bond, and the obligee releases one, mistakingly believing that the other will remain bound, equity will not grant him relief, for the reason that the release is just what he intended it to be: his mistake related to the effect of the contract in matters not contemplated therein."

But that principle has no application to the proposition now under consideration, because the mistake of law involved in this case has to do with: First, the selection of the form of instruments; or, second, the adoption of inappropriate phraseology which fails to carry out the mutual intention of the parties.

In other words, the mistake of law here involved arises because, through the error, the contract failed to express the true intention of the parties. If, on the other hand, the contract has expressed the true intention of the parties, then equity would not relieve because the mistake of law otherwise arose. To illustrate, it is said in Stafford v. Fetters (55 Iowa 484), supra, reading on page 486:

"The mistakes of law against which equity will not relieve are those which pertain to the subject of the contract, and were inducements thereto, or considerations therefor. In such cases

1370

the parties intended to make the very contracts which they executed, but were induced to make them by a mistake of law.''

Previous to that statement, this court, in the Stafford case (55 Iowa 484), supra, declared:

"The rule [that equity will not relieve some mistakes of law] has no application to mistakes in the language of a contract, or in the choice of the form of an instrument whereby it has an effect different from the intention of the parties. If parties intending to sell and purchase lands should, in ignorance of its legal effect, execute a lease, equity would reform the instrument though it was a mistake of law which led them to adopt it. This mistake, it will be noticed, affects the very contract the parties intended. They intended a deed, but a lease was made."

Again this rule was approved in Hausbrandt v. Hofler (117 Iowa 103), supra, where we stated on page 105:

"In the same case [Stafford v. Fetters, 55 Iowa 484, supra] it is also said that the rule that equity will not relieve against mistakes of law 'has no application to mistakes in the language of a contract or in the choice of the form of an instrument, whereby it has an effect different from the intention of the parties. If parties intending to sell and purchase land should, in ignorance of its effect, execute a lease, equity would reform the instrument although it was a mistake of law which led them to adopt it.' ''

Likewise in Bonbright v. Bonbright, 123 Iowa 305, reading on page 309, we said:

"It is now well settled in this state that a court of equity will reform a contract even where, through mistake of law, it does not express the true intent of the parties thereto."

The following authorities are to the same effect: Courtright v. Courtright, 63 Iowa 356; Hallam v. Corlett, 71 Iowa 446; Hyde Park Investment Co. v. Glenwood Coal Co., 170 Iowa 593; Day v. Dyer, 171 Iowa 437; General Motors Acceptance Corporation v. Baker Mfg. Co., 199 Iowa 155; In re Estate,of Patterson, 199 Iowa 362; Kowalke v. Evernham, 210 Iowa 1270.

So, then, in the case at bar, if the note and mortgage under consideration, because of their inapt form or mistaken phrase-

ology, do not express the true intention of the parties and those instruments were used through mutual mistake, equity will reform the written documents to make them comply with the true intention of appellee and the late Emma C. Floberg. Before such relief will be granted, of course, the evidence offered to show the mutual mistake must be clear, satisfactory, and convincing. Rankin v. Taylor, 204 Iowa 384; Kowalke v. Evernham (210 Iowa 1270), supra.

There is left for determination, then, the question whether the evidence furnished by the appellee in the case at bar is clear, satisfactory, and convincing that a mutual mistake did prevent the note and mortgage from expressing the true intention of the parties thereto. Much of the evidence has already been set forth. It is necessary, however, to refer to the same in more detail.

As previously stated, appellee did not originally want to buy the home farm because he could not finance the same. In fact, appellee was stubborn in his resistance to the program outlined by Emma C. Floberg. On several occasions, appellee became angry when his stepmother urged him to buy his sister's interest in the land. Manifestly, as before said, it was appellee's plan to sell his own interest in the home farm and buy eighty acres of land which he could finance. Being loyal to her late husband, Emma C. Floberg insisted and persisted that appellee buy the home farm. Neighbors were called in, as before explained. These neighbors told Emma C. Floberg that appellee could not buy the farm at the price named because the land was not worth $23,000. Even after Emma C. Floberg proposed that appellee buy the land on the funds to be furnished by her, he still objected. Finally, as previously stated, she said that the funds thus furnished need never be returned because she would be satisfied if paid five per cent interest on the money during her lifetime. Nevertheless, appellee objected even to that proposition, because he said the interest, together with the taxes and the upkeep of the farm, would amount to practically $10 per acre. Therefore he declared he could not finance the proposition.

Ultimately, however, after being continually persuaded by Emma C. Floberg and her neighbors, appellee did consent to accept the farm on the basis outlined. It was only upon that basis, however, that appellee did accept the farm. This fact is testified to by many witnesses who were neighbors and friends of the late

Emma C. Floberg's. Those witnesses are George Lindberg, Emil Lundgren, Mrs. Lillie Lindberg, J. W. Swanson, Simon Anderson, Mrs. Alice Lantz, and Alex Lantz. Corroboration for those witnesses may also be found in the testimony of others. When appellee and Emma C. Floberg went to the banker for the purpose of having the papers drawn, they were ignorant about business transactions. The banker was not told of the plan and agreement between the parties, but they simply asked him to draw a note and mortgage. After the note and mortgage had been executed by appellee and delivered to Emma C. Floberg, she, on many occasions, told her friends and neighbors what she had done, and that when she was dead, the note and mortgage should terminate and be uncollectible. These conversations on her part continued down to the time of her death.

An argument is made by appellant that Emma C. Floberg must have intended to receive payment of the principal on the note and appellee contemplated paying the same because on the instrument there is written in type the following: "'Borrower to have option of paying in multiples of even $100.00 any interest pay date." That language, however, was not inserted on the note at the request of either Emma C. Floberg or appellee. Neither of them apparently understood its significance. Such insertion was made voluntarily by the scrivener. Again, it is said by a witness for the appellant that Emma C. Floberg, shortly before her death, stated that appellant, through her will then drawn, would receive the principal and interest still due on the $23,000 mortgage. Obviously, however, this witness, in view of the testimony of the many witnesses, must have misunderstood Mrs. Floberg. She undoubtedly referred to the interest due. This thought is supported by the testimony of Dr. J. L. Seabloom, who attended Mrs. Floberg during her last illness. Upon an occasion during that time, Mrs. Floberg asked for the doctor's bill, saying: "I have a little money left, not very much." Why would she have made that statement if she had understood the principal of the $23,000 mortgage belonged to her? More than that, at the same time Mrs. Floberg said to the doctor: "I have willed what little I have left to my brother C. E. T. Peterson [the appellant]."

Mrs. Floberg, when she came to America, was a poor, working girl, and she never had a great deal of money in her own

right. The most property she ever possessed was the amount received through her late husband's estate. That amount was fully represented by the consideration named in the $23,000 note and mortgage. If, then, Mrs. Floberg still had the principal in that $23,000 note and mortgage, she probably never would have told the doctor, during her last illness, that she had very little money left. Clearly, Mrs. Floberg intended, as did the appellee, that upon her death the note and mortgage should terminate.

Beyond peradventure of doubt Mrs. Floberg had a little property of her own. It is to be recalled that she received $3,000 from the loan to her husband, and appellee had been paying her the interest yearly on the $23,000. So, too, there was the house in Red Oak. Undoubtedly it is true that part of the moneys aforesaid may have been invested in that house, but nevertheless in all events she had some property at the time of her death. For the purpose, no doubt, of disposing of this limited amount of property to her own relatives, she made the will, without any thought of disturbing the properties involved in her late husband's estate. There is every reason to believe that Emma C. Floberg did not feel that she owned the principal of the $23,000 note and mortgage, and therefore did not attempt to convey the same to appellant through her will. Appellee and Mrs. Floberg, because of all the facts and circumstances above mentioned and considered, unquestionably agreed during the year 1924 that the former was to buy his sister's one-half interest in the home farm with funds to be furnished out of his father's estate by his stepmother, Mrs. Floberg. In return for her kindness in the matter, she was to receive during her lifetime from him interest on the $23,000 paid to his sister. Moreover, he was to pay the taxes on the farm and keep up the improvements. He has paid the taxes and kept up the improvements.

When appellee and Mrs. Floberg went to the scrivener to have the note and mortgage drawn, they intended that the aforesaid oral understanding should be embodied in, and expressed by, the note and mortgage. This understanding was not expressed in the note and mortgage, because the instruments used were not in proper form, and the language employed was not apt to express the mutual purpose. Hence, a mutual mistake prevented the note and mortgage from expressing the true contract of the parties. That this is so, is shown by clear, satisfactory, and

convincing evidence. Then, under the circumstances, the appellee is entitled to have a reformation of the instruments in the manner and way made by the district court, in order that those documents will embody the true intention of the parties involved. Furthermore, appellee should have the title to the aforesaid real estate quieted in him.

Wherefore, the judgment and decree of the district court must be, and hereby is, affirmed.—Affirmed.

WAGNER, C. J., and EVANS, MORLING, and GRIMM, JJ., concur.